23 So.2d 577

## WILKINSON v. McCALL.
### 6 Div. 322.

Supreme Court of Alabama.
June 30, 1945.

Rehearing on Motion to Retax Costs Denied
Nov. 1, 1945.

Bradley, Baldwin, All & White, of Birmingham, for appellant.

Sadler & Sadler, of Birmingham, for appellee.

227

STAKELY, Justice.

This proceeding involves the allowance of an attorney's fee from the estate of a decedent. It was begun by a petition of Bethea McCall, as coexecutor and cotrustee, which was filed in a cause in equity styled "In the Matter of the Estate of Edward Wilkinson, deceased." The appellant, Edward Wilkinson, Jr., is one of the executors and trustees named in the will of the decedent. Bethea McCall, appellee, was appointed as successor to the appellant's sister, Mrs. Elizabeth Lanier, by decree entered on November 16, 1942. She was the other executor and trustee named in the will. After being appointed as such coexecutor and cotrustee, Bethea McCall was authorized by the court to employ W. H. Sadler, as one of the attorneys for the executors and trustees.

On January 21, 1943, payment of $1,000 as a retainer fee to Mr. Sadler was authorized by the court, over the objection of appellant. On September 5, 1944, on petition of Bethea McCall, as coexecutor, over the objection of appellant a decree was entered by the court authorizing and directing the executors to pay an additional $1,500 to Mr. Sadler out of the assets of the estate for services rendered as an attorney. The petition alleges in detail the services claimed to have been rendered. This appeal is from that decree.

This particular proceeding appears to be an incident of a bitter family dispute which has produced much litigation. Appeals involving other phases of the litigation have been submitted to this court. The testimony is voluminous on all these matters.

It would be utterly impractical to set it all out, but some understanding of the general situation is necessary in order to understand this particular case. So we shall proceed to outline in substance the relevant events.

Edward Wilkinson died on November 6, 1941, at the age of seventy-seven, leaving surviving him his widow, Grace Wilkinson, aged seventy-five, who is non compos mentis, and four children, Mrs. Marguerite Mudd, wife of J. P. Mudd; Mrs. Elizabeth Lanier, wife of Sterling Lanier; Mrs. Dimmis Riley, wife of E. W. Riley; and Edward Wilkinson, Jr.

The estate of the decedent consisted principally of 151 shares of common stock of the Western Grain Company, an Alabama corporation. There were also a few shares of stock in other corporations, valued at about $13,000. The decedent left a will which was probated in the Probate Court of Jefferson County on November 14, 1941. Pursuant to the directions of the will, Edward Wilkinson, Jr., and Mrs. Lanier were appointed co-executors.

During the life of Edward Wilkinson he created five separate trusts for the benefit respectively of his wife and four children. He named himself trustee in each of the trusts and named Edward Wilkinson, Jr., and Mrs. Lanier as successor cotrustees. The property in each of the trusts consisted only of shares of common stock in the Western Grain Company, divided as follows: Mrs. Grace Wilkinson, 30 shares; Mrs. Dimmis Riley, 30 shares; Mrs. Marguerite Mudd, 20 shares; Mrs. Elizabeth Lanier, 20 shares; and Mr. Edward Wilkinson, Jr., 20 shares; a total of 120 shares. At the time of his death there were outstanding 500 shares of common stock and 150 shares of preferred stock in the Western Grain Company.

On December 10, 1941, the Western Grain Company issued its stock certificate No. 71 for the 151 shares standing in the name of Edward Wilkinson, Sr., to Edward Wilkinson, Jr., and Elizabeth Lanier, as coexecutors, and the company also issued its five other separate certificates to them as trustees under the five trusts.

On December 17, 1941, a meeting of the stockholders was called, at which it was proposed to elect Edward Wilkinson, Jr., as president of the company. Mr. and Mrs. Mudd objected on the grounds that he was neither capable nor fit for the office. The

voting resulted in the election of Edward Wilkinson, Jr. Edward Wilkinson, Jr., and Mrs. Lanier voted for Edward Wilkinson, Jr., their individual stock, also the 151 shares belonging to the estate and also the 120 shares of trust stock. They were joined by Mr. Lanier and Mr. McCall. Mr. and Mrs. Mudd voted for Bethea McCall. The salary was fixed at $12,000, and Edward Wilkinson, Jr., was voted a bonus and other benefits.

On December 22, 1941, Mr. and Mrs. J. P. Mudd and Mrs. Grace Wilkinson, by Mr. Mudd as next friend, filed a bill in equity, praying for the removal of Edward Wilkinson, Jr., as president of Western Grain Company, and the removal of Edward Wilkinson and Elizabeth Lanier as executors and trustees. That was cause No. 53,010. On May 25, 1942, the suit was settled by agreement, which also dealt with a matter which J. P. Mudd had in the meantime brought up. This was the alleged lien of the Western Grain Company on the stock of the decedent for $148,000 alleged to be an amount owing to the company by the decedent for overdrafts. Among other things the decree settling the litigation enjoined Edward Wilkinson and Mrs. Lanier from voting any stock standing in their names in a representative capacity for the benefit of any executor in the estate of Edward Wilkinson or trustee in the trusts created by him, as a salaried officer in Western Grain. The decree also provided for the resignation of Edward Wilkinson, Jr., as president of Western Grain Company and for the resignation of Mrs. Elizabeth Lanier as co-executor and co-trustee. It also provided that the appointment of a successor co-executor and co-trustee would be made exclusively by the court. The decree also provided for recovery by J. P. Mudd of the sum of $15,000 against Western Grain Company, to be satisfied by the issuance to J. P. Mudd, all common stockholders concurring, of 150 shares of the preferred stock in Western Grain Company.

At the conclusion of the foregoing litigation, Bethea McCall reluctantly agreed to be made general manager of the company at a salary of $12,000 and to become president at a nominal salary of $1.00 per year. Under the management of Bethea McCall the business of the company increased from four million dollars a year to a volume of thirteen million dollars a year in 1943 and 1944.

The prosperity of the company, however, produced new difficulties and disagreements among the stockholders. The company had moved into the 80% income tax bracket. The differences among the stockholders grew out of differences in opinion as to how taxes could be saved by increase in salaries or otherwise. Nothing, however, was accomplished and there was talk of instituting litigation to set aside the settlement of May 25, 1942. Mr. McCall was opposed to the suggestion.

In the meantime Judge Bailes, who had entered the decree of May 25, 1942, was doing his best to secure a suitable person to serve as coexecutor and cotrustee. Both Mr. Karl Landgrebe and Mr. John Frye declined the appointment. Likewise the Birmingham Trust & Savings Company and also the First National Bank or Birmingham refused to serve. Finally Judge Bailes asked Bethea McCall to serve, stating that he would perhaps be able to render a service to all concerned. He agreed, provided no one objected. No objection was made and he was appointed on November 16, 1942.

Being aware of the disputes of the parties, the threats of receivership, dissolution and litigation to set aside the settlement, he felt the need for independent legal advice, since the attorney for the executors and trustees also represented the Laniers and Edward Wilkinson, Jr. Accordingly, as stated, he obtained the authority through decree of the court to employ W. H. Sadler to represent the coexecutors and cotrustees.

There was a great deal of discussion of the possibility that the decree of May 25, 1942, would be attacked and one of the first matters to which Messrs. McCall and Sadler gave their attention was to determine what attitude Mr. McCall should take with reference to such litigation and to the election of directors of the company at the annual meeting to be held December 16, 1942. On December 15, 1942, a preliminary injunction was granted, preventing J. P. Mudd from voting the 150 shares of preferred stock of the Company issued pursuant to the consent decree. Mr. Sadler had advised Mr. McCall that the preferred stock had voting privilege and to vote for the directors nominated by Mr. Mudd. Edward Wilkinson, Jr., did not attend the meeting. Accordingly the stock of the estate and the living trusts could not be voted and so, there being no quorum, no action

was taken for the election of directors. It is insisted that Mr. Sadler gave erroneous advice as to the voting power of the preferred stock.

The bill filed in the new cause, No. 55708, in which the preliminary injunction was issued, attacked, among other things, the decree in cause No. 53,010 as being fraudulent, and took the position that the decree awarding J. P. Mudd the sum of $15,000 was erroneous and the 150 shares of preferred stock wrongfully issued in satisfaction thereof.

In the meantime the matter of the estate tax was becoming a matter of growing importance. In the early part of 1943 the estate tax return was filed, the stock in Western Grain being valued at $854.76 a share. All of the stock in the trusts was excluded from the return. However, during the summer of 1943, the tax agent, one Benefield, gave notice that he intended to propose a deficiency estate tax assessment on the basis of a higher valuation of the stock and also upon inclusion in the estate of the stock in the trusts, because such stock constituted a gift in contemplation of death. Nothing could be done to change the tax agent's opinion, except that he agreed to place a valuation of $1,100 a share, which was less than he originally proposed. Such an assessment would call for an additional payment of $52,000. The estate had only $6,000 in cash.

There was much difference of opinion and controversy as to how the problem of raising money to meet the tax should be met. A petition was filed on October 16, 1943, by the coexecutors asking the court for instructions. There is no need to go into great detail, but while evidence was being taken on that petition, a deputy collector, armed with a warrant of distraint issued upon the jeopardy assessment, seized certificate No. 38 for 150 shares and certificate No. 41 for one share of stock in Western Grain. These certificates had been previously surrendered to Western Grain Company, after the death of Edward Wilkinson, Sr., in exchange for a new certificate, No. 71 (referred to above), for 151 shares, issued to the coexecutors and cotrustees at that time. The collector was threatening to sell at least 150 shares of the stock at public sale, as shown by his announcement to that effect.

On January 20, 1944, the court entered a final decree, which, without going into details, provided a plan for raising the money to meet the assessment through a sale of stock under certain conditions. The decree enjoined disposition of the stock on a basis at variance with the decree. The same day the decree was superseded by a supersedeas bond executed by E. W. Riley, as guardian, and Mr. and Mrs. Mudd, as sureties. The next day Bethea McCall, as coexecutor, and Mrs. J. P. Mudd made a contract under which, among other things, Mrs. J. P. Mudd agreed to purchase 151 shares of the common stock on a certain basis. In brief, the price per share was less than the price contemplated by the court in its decree. It is claimed that this contract violated the decree of January 20, 1944, and brought the parties into contempt of court. A petition to hold them in contempt of court is one of the phases of the litigation now before this court.

On February 3, 1944, the collector held his sale, selling thirty-four shares of the stock on a basis of $1,480 per share to Mrs. Lanier and the tax was paid.

When the petition to fix a fee for Mr. Sadler came on for hearing, the point was made that the petition for the fee should not be heard until the petition to hold Bethea McCall in contempt was first heard. However, Mr. Sadler eliminated any claim for services in connection with the petition of October 16, 1943, which is the petition on which the decree was rendered, which is claimed to have been violated.

Reversal is sought on the grounds that (1) Bethea McCall, being in contempt of court for violation of the prohibitory injunction, should be denied the privileges of a litigant until purged of contempt of court and until so cleared is in no position to ask for authority to make a further payment for attorney's fees; and (2) the allowance is unreasonable.

[redacted] There seems to be some doubt on the part of counsel as to whether the decree allowing W. H. Sadler a fee of $1,500 is an interlocutory order or a final decree. The decree is a final decree. It is true that usually the executor employs counsel in his personal, not his representative capacity, and then on paying him, asks for reimbursement from the trust. Taylor et al. v. Crook, Adm'r et al., 136 Ala. 354, 34 So. 905, 96 Am.St.Rep. 26; 21 Am.Jur. 503. But there appears no good reason why the court, wherein the estate is being administered, may not make the allowance directly to the attorney from the estate

when the services are for the common benefit of the parties interested in the estate. Section 63, Title 46, Code of 1940; Keith & Wilkinson v. Forsythe, 227 Ala. 555, 151 So. 60; Bidwell v. Johnson et al., 191 Ala. 195, 67 So. 985; 21 Am.Jur. 503. Services for the common benefit of the parties mean services that are of benefit to the common estate, or in other words services rendered in a matter in which the trust as a trust is interested and not services in behalf of the individual interests of the parties to the cause. Bidwell v. Johnson, supra; Coker v. Coker, 208 Ala. 239, 94 So. 308.

 The procedure followed in the case at bar was peculiarly appropriate. Bethea McCall did not wish to serve as executor. He did so only to serve the common interest. He realized that he was between two factions that felt bitterly toward each other. Edward Wilkinson, Jr., was personally represented by counsel, who were representing the estate. Bethea McCall felt that he needed independent advice. There was no need for him to run the risk of being personally liable for the services of an attorney and being forced to pay for the services himself. The risk lay in the fact that his coexecutor had joint control with him over the funds of the estate and objected to the employment of additional counsel. Scruggs v. Driver's Ex'rs, 31 Ala. 274, 287.

Under the circumstances Bethea McCall acted wisely in taking the matter directly to the court. The court had the power to authorize employment of W. H. Sadler as an attorney, and to fix his fee for services rendered. It should be here noted that services rendered in connection with the internal management and control of Western Grain Company, or services rendered in connection with problems relating to its stock, were necessarily of common interest to the parties interested in the estate, because the assets of the estate, substantially speaking, consisted solely of stock in Western Grain Company. Since the decree finally determined the amount of the fee, and authorized payment thereof out of the assets of the estate, it could not be otherwise than a final decree and as such will support on appeal. Equity Rule 69, Code 1940, Tit. 7 Appendix; authorities, supra.

 The reasons advanced to prevent payment to W. H. Sadler for his services do not appear to us to be convincing. The matter of contempt of court on the part of Bethea McCall for violating the prohibitory injunction issued by the court will be determined in another phase of the litigation. It is ordinarily true that "a party in contempt is not entitled to insist upon a hearing or trial of the case out of which the contempt arose until he first purges himself of the contempt." 12 Am.Jur. 438; Skirven v. Skirven, 154 Md. 267, 140 A. 205, 56 A.L.R. 697; Jacoby v. Goettner, 74 Ala. 427. But Bethea McCall, in asking for authority to make payment for the services of W. H. Sadler, is not primarily seeking a hearing for himself, but for W. H. Sadler. Sadler is entitled to be paid for his services by reason of his contract with Bethea McCall made under sanction of the court. Contempt, if any, on the part of McCall cannot deprive Sadler of his rights. Any connection that Sadler might have with the action of McCall that has been claimed to be contempt by Edward Wilkinson, Jr., has been taken out of the case at this time because no payment is sought for services in connection with the petition of October 16, 1943, or the decree of January 20, 1944. The inquiry in the present proceeding was limited not only to matters entirely unconnected therewith, but was limited in point of time to a period prior thereto. See 17 C.J.S., Contempt, § 97, p. 138. We are not passing on his right to payment for services connected with the petition of October 16, 1943, and matters subsequent thereto, because that is not before us. The lower court so understood the matter, as shown by its decree. There can be no objection to a payment for his services to a particular date. "The expenses of administration may be paid as the services are rendered, otherwise the administrator may not be able to procure efficiency in their rendition, and since no statute or rule of law is to the contrary." Walsh v. Walsh, 231 Ala. 305, 164 So. 822, 827.

 W. H. Sadler undertook a difficult assignment under trying conditions. His good faith is not questioned. We do not imply nor will we undertake to see if his legal opinions were correct, as for instance his opinion on the voting power of the preferred stock, because that is not the criterion. 7 C.J.S., Attorney and Client, § 166, p. 1023. See also First Nat. Bank of Mobile v. Watters, 201 Ala. 670, 79 So. 242; McKenzie v. Jenson, 212 Ala. 92, 101 So. 755. If it were, attorneys might well hesitate to serve in matters involving difficult questions or in litigation uncertain in result. He had serious and diverse prob-

lems to consider growing out of the circumstances which have been in part set forth. Upon a careful consideration of the evidence, we think he earned the fee which has been allowed.

The decree of the lower court is affirmed.

Affirmed.

All the Justices concur.