474 So.2d 53 (1985)
Carl P. FARLOW; S.F. Carter; P.W. Green; R.M. Bragdon; J.P. Doughty; John M. Harbert III; Allen Post; William R. Eagan; C.C. Fargason, Jr.; J.A. Bragan; & W.E. Snow, Individually, and as members of the Board of Directors of American Cast Iron Pipe Co., et al.
v.
Leland C. ADAMS, Jr., et al.
Leland C. ADAMS, Jr., et al.
v.
Carl P. FARLOW, et al.
83-494 and 83-543.
Supreme Court of Alabama.
June 21, 1985.
As Modified on Denial of Rehearing July 19, 1985.
*54 A.J. Noble, Jr., Robert G. Tate, and F.A. Flowers III of Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, for appellants.
W. Eugene Rutledge of Rutledge, Fay & Kelly, and Robert L. Wiggins, Jr. of Wiggins & Quinn, Birmingham, for appellees.
MADDOX, Justice.
These cases were consolidated on appeal. At issue is the termination from employment of the entire Board of Operatives of the American Cast Iron Pipe Company (ACIPCO).
ACIPCO is a Georgia corporation with its principal place of business in Jefferson County, Alabama. The members of the Board of Operatives were employed in the company's Birmingham plant at the time of their discharge. All shares of common stock in ACIPCO are held in trust for the benefit of ACIPCO employees according to the provisions contained in the will of John J. Eagan.[1] Under the terms of the trust, the Board of Operatives, which consists of twelve elected ACIPCO employees, is charged, along with the Board of Management, with the duties of trustees. Two members of the Board of Operatives are elected to serve on the Board of Directors.
The Board of Management consists of the corporate officers of ACIPCO. The Board of Management also constitutes the Executive Committee of the Board of Directors.
According to the trust agreement, dividends are paid to the Board of Management and the Board of Operatives as the *55 trustees of the employees, and the dividends are invested by the trustees to insure that each employee is provided an income which, together with the wage or salary, will insure a living wage to all employees.
The Board of Operatives and the Board of Management have disagreed for several years over their respective roles, and the disputes have centered on the desire of the Operatives to establish a stronger voice in company decisions. The disputes culminated in February 1983, when the Operatives employed a private accounting firm to make an investigation of ACIPCO's books. The audit focused on the extra compensation plan of the company, which was developed by Management to apportion company profits among employees as a bonus. This plan became a substitute for the payment of dividends over which the Operatives, as trustees, would have had a vote.
The Operatives' accountants found that as a result of certain accounting principles used by the Board of Management, ACIPCO employees had been deprived of over $24,000,000 in extra compensation over a twenty-year period. In particular, the report indicated that the accounting principles and decisions utilized by the Board of Management resulted in improper charges made against income, based primarily on the following: (1) utilization of inconsistent methods of inventory; (2) deductions from the extra compensation plan to compensate the company for federal income taxes not actually paid; (3) improper deduction of letters of credit; and (4) failure to properly adjust income used for extra compensation computation purposes after a tax audit. These accounting principles were generally characterized by the accountants as not being in accordance with generally accepted accounting principles or as being inconsistent with the company's own accounting practices.
On March 31, 1983, the Operatives' attorney forwarded to the Board of Management a copy of the accountants' report, along with a letter to the Board of Management asking for repayment and rearrangement of the power structure so that the Operatives would be on an equal footing with the Board of Management.
Thereafter on April 10, 1983, the Board of Operatives initiated and held a public meeting away from the ACIPCO premises and invited all ACIPCO employees. Members of the public, including the news media, were permitted to attend. At this meeting, statements and a report were given by the Operatives' attorney and accountants. The letter of March 31, 1983, from the Operatives' attorney was also read at the meeting.
Later, after further correspondence and one meeting between the Board of Operatives and the Board of Management, the company attorney requested that the Operatives place and submit their oral proposals in written form.
On May 10, 1983, the Operatives' attorney complied with the request and submitted the proposals in a letter. As a "short term solution," the Operatives proposed, among other things, the immediate seating of a Board of Directors composed of five members of the Board of Operatives plus two nominees by that group, and five members of the Board of Management, plus two nominees of that group.
Without further contact or correspondence between the Board of Operatives and the Board of Management or their attorneys, a special meeting of the Board of Directors of ACIPCO was held on May 16, 1983. At this time, the Board of Directors issued a resolution terminating all members of the Board of Operatives as employees of the company. This resolution also directed that a special election be called to fill the vacancies created on the Board of Operatives. In addition, the Board of Directors determined that the Operatives had violated their oath required by the Eagan Plan;[2] had caused turmoil among the employees *56 and disruption in the company's operations; had falsely accused the officers and directors of mismanagement, of depriving the employees of bonus benefits, of wrongful control of company funds and facilities, and of a lack of good faith in their dealings with the Board of Operatives; and, further, that they were attempting to usurp the prerogatives of management in violation of the terms of the Eagan Trust.
The Operatives filed suit, seeking their reinstatement as employees of ACIPCO, contending that they were wrongfully discharged. In addition, the Operatives sought an award of attorneys' fees.
After reviewing the evidence, the trial court found that the Operatives were not employees at will and, therefore, could only be discharged for cause. The trial judge, sitting as the trier of fact, heard ore tenus evidence and found as follows:
"The Eagan Trust, its principles, the consequential ownership of the stock of the company and the relationship of the management and the employees has created an employer-employee status that is unique in American industry. It is a relationship that has some of the attributes of an employee contract and some of the beneficial interests of beneficiaries of a trust estate. The relationship here falls wholly into neither category, but potentially in each. The result, in the Court's opinion, is that the employees of ACIPCO are not employees at will, but may be discharged only for cause."
Because the evidence indicated that the Operatives were not terminated for reasons related to their jobs or duties as employees, but for their actions as members of the Board of Operatives, the lower court reinstated the Operatives as employees of ACIPCO and as members of the Board of Operatives. The lower court also determined, however, that the Operatives were not entitled to attorneys' fees. We affirm the trial court's order reinstating the Board of Operatives as employees of ACIPCO but reverse the judgment of the trial court insofar as that judgment refused to award attorneys' fees, for the reasons hereinafter stated.

I
The Board of Management contends that because the Operatives were not employed under contract for a definite term, the trial court erroneously reinstated the Operatives as employees of ACIPCO. We disagree.
Concededly, at common law, an employment contract of indefinite duration is terminable at will by either party with or without justification or cause and without legal liability. Hinrichs v. Tranquilaire Hospital, 352 So.2d 1130 (Ala.1977). The principle announced in Tranquilaire has been criticized as being unsound, but we need not discuss it here because we think it is inapplicable in this case. The case at hand involves a unique situation where employment contract principles are not exclusively applicable, and neither are principles of law concerning trusts exclusively applicable. ACIPCO's unique corporate structure is such that this Court is presented with a case of first impression which requires us to harmonize these two areas of the law involving the rights of employees.
This Court has previously considered the rights of ACIPCO employees in Duff v. American Cast Iron Pipe Company, 362 So.2d 886 (Ala.1978); and Smith v. American *57 Cast Iron Pipe Company, 370 So.2d 283 (Ala.1979). In both Smith and Duff, this Court held that "[i]n the ACIPCO community a contractual precondition to discharge is that the employee be found to have violated one or more of the established plant rules." 362 So.2d at 888; 370 So.2d at 287. (Emphasis added.)
Here, however, the Operatives were not fired because of a violation of a plant rule, but because of their efforts as trustees of the Eagan Trust to correct what they considered was a wrongful use of ACIPCO funds and their diversion from the beneficiaries of the trust.
The evidence supports the trial court's finding that the employees were discharged without cause. Mr. Farlow, the president of ACIPCO, was questioned regarding the Operatives' performance as employees; he responded as follows:
"Q. Well, you say you removed these discharged these men as employees, is that correct?
"A. Yes, sir.
"Q. Do you know of any violation committed by any of these men of the rules contained in the Employees Handbook?
"A. No, sir.
"Q. Do you know of anything that these men did wrong in connection with their work for Acipco?
"A. No.
"Q. In fact, these men were good employees of Acipco, weren't they?
"A. Yes, sir."
The Operative's "short-term" proposal to change the composition of the Board of Directors was characterized in the discharge resolution as a violation of their oath of office and not in accord with the Eagan Plan. The proposal was further characterized as an attempt by the Operatives to usurp the prerogatives of management.
It is apparent that the Board of Management's contention that the Operatives were only dicharged as employees is refuted by the testimony of Mr. Farlow and by the language of the discharge resolution itself, which indicates that the Operatives' "short-term" proposal to change the composition of the Board of Directors was one of the primary reasons for the action taken against the Operatives.
As this Court has held in other cases, the decision we reach must necessarily be influenced by the law of trust. This Court's duty, as we understand it, in resolving the dispute at hand, is to carry out the intent of the settlor. In Edmonson v. First Nat'l Bank of Birmingham, 256 Ala. 449, 55 So.2d 338 (1951), this Court stated the following:
"It has been authoritatively stated that the intent and purpose of the settlor of the trust is the law of the trust. Lovelace v. Marion Institute, et al., 215 Ala. 271, 272, 110 So. 381. And, again, `The fundamental and cardinal rule in the interpretation of wills is that the intention of the testator, if not inconsistent with some established rule of law or with public policy, must control, and it is the duty of the courts to ascertain such intention and to give force and effect to the scheme that he had in mind for the disposition of his estate.' 30 Am. & Eng. Ency. Law (2d Ed.) p. 661. Castleberry v. Stringer, 176 Ala. 250, 57 So. 849, 850."
256 Ala. at 464, 55 So.2d at 352-53.
In ascertaining this intention, we look to the concluding paragraph of the codicil to the Eagan will:
"The trustees, appointed by this Codicil, in accepting the trust and acting hereunder will be trustees both for said employees and said persons requiring the product of said company. It is my will and desire that said trustees in the control of said company, through the control of said common stock, shall be guided by the sole purpose of so managing said company as to enable said American Cast Iron Pipe Company to deliver the company's product to persons, requiring it, at actual cost, which shall be considered the lowest possible price consistent with the maintenance and extension of reasonable salaries and wages *58 to all employees of said company, my object being to insure `service' both to the purchasing public and to labor on the basis of the Golden Rule given by our Lord and Savior Jesus Christ."
It is obvious that Christian principles were uppermost in the mind of the settlor when he set up the Eagan Trust. Before the trust was implemented, John Eagan explained his proposals to create the trust in a speech to his employees. He stated, "The teachings of Jesus Christ are to be made the controlling principles of the American Cast Iron Pipe Company." He believed that a business could be operated by the practical application of Christian principles and the Golden Rule. In furtherance of this objective, Eagan, in the codicil to his will, established the trust and intended to bring the wisdom of the employee representatives, the Operatives, into meaningful deliberation with the management representatives regarding the manner in which ACIPCO common stock, the corpus of the trust, was to be controlled. It is apparent that if Company management were permitted to randomly fire at will any employee who was a member of the Board of Operatives, there would be no meaningful role for the employee trustees in the management of the company. It is assumed that "a settlor generally appoints more than one trustee because of his desire to attain for the beneficiaries of his trust the benefit of the wisdom of each ...." Birmingham Trust National Bank v. Henley, 371 So.2d 883, 895 (Ala.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1273, 63 L.Ed.2d 598 (1980). This principle of law is applicable here, especially in view of Mr. Eagan's benevolent intent to create a trust which would operate a corporation adhering to Christian principles and which would benefit the public, who bought its product, and the employees who made it.
Furthermore, the law is clear that a construction of a trust which confers on a trustee absolute or unbridled powers is never favored by a court of equity. Gaines v. Dahlin, 228 Ala. 484, 154 So. 101 (1934); Hawkins v. Tanner, 243 Ala. 641, 11 So.2d 351 (1942); Belcher v. Birmingham Trust Nat'l Bank, 348 F.Supp. 61 (N.D.Ala.1968). The ability of the Board of Directors of ACIPCO, dominated and controlled by the Board of Management, to arbitrarily and unilaterally discharge the employee trustees of the Eagan Trust, the Board of Operatives, would clearly result in the Board of Management's having unbridled and absolute power over the trust estate. We cannot construe the Eagan Trust to vest in management this power.
Finally, the Restatement (Second) of Trusts § 107 (1959), provides as follows:
"A trustee can be removed:
(a) by a proper court [Code 1975, § 19-3-311]; or
(b) by the person, if any, who by the terms of the trust is authorized to remove the trustee." (Emphasis added.)
No provision in the codicil of the Eagan will specifically provides for involuntary removal of one co-trustee by the other co-trustee. In Matter of Estate of Amason, 369 So.2d 786 (Ala.1979), this Court stated:
"The removal of a trustee is such a drastic action that it should be taken only when the estate is actually endangered and intervention is necessary to save trust property." (Emphasis added). 369 So.2d at 790.
Applying the above trust principles and employment contract principles to the case at hand, we must conclude that Mr. Eagan intended that the Board of Operatives could be discharged only for cause. A contrary holding would allow the Board of Management unlimited control and would totally disregard Mr. Eagan's intent and purpose in creating the trust. Consequently, we agree with the trial court's order which reinstated the employees who were members of the Board of Operatives.

II
The Operatives, although they were reinstated, were dissatisfied with that portion of the trial court's order wherein the trial court found that they were not entitled to *59 attorney's fees because "attorney's fees are not authorized by law." They appeal from that order.
The Operatives did not seek in this suit any relief regarding the alleged mismanagement of the bonus plan, maladministration by the Board of Management, or wrongful control of company funds and facilities. Because of this, the Board of Management contends the Board of Operatives is not entitled to attorneys' fees; Management contends that the Operatives commenced this litigation to obtain their reinstatement as employees, and that the outcome of the litigation primarily benefited the Operatives themselves and not the trust. We disagree.
In Alabama, when the contentions of a party in litigation are in the interest of and for the benefit of the entire trust estate, the courts will award costs and attorneys' fees from the trust estate to the party benefiting the trust estate. Wilkinson v. McCall, 247 Ala. 225, 23 So.2d 577 (1945); Grace v. Dodge., 245 Ala. 346, 17 So.2d 237 (1944); Coker v. Coker, 208 Ala. 239, 94 So. 308 (1923).
The issue of whether defending against an unsuccessful attempt to remove a trustee is considered a personal benefit to the trustee and not a common benefit of the trust was addressed in Weidlich v. Comley, 267 F.2d 133 (2d Cir.1959). There, Judge Learned Hand held:
"Coming then to the merits of the dispute, the plaintiff's first complaint is the allowance to the defendant out of the trust assets of his expenses in defending himself in the action. The argument is that these expenses were incurred in the defendant's individual interest, and may not be charged against the trust. That completely misses the true situation: a trustee was appointed to administer the assets; the settlor selected him to do so, and whatever interferes with his discharge of his duty pro tanto defeats the settlor's purpose. When the trustee's administration of the assets is unjustifiedly assailed it is a part of his duty to defend himself, for in so doing he is realizing the settlor's purpose. To compel him to bear the expense of an unsuccessful attack would be to diminish the compensation to which he is entitled and which was a part of the inducement to his acceptance of the burden of his duties. This has been uniformly the ruling, so far as we have found. Jessup v. Smith, 223 N.Y. 203, 207, 119 N.E. 403; Matter of Bishop's Will, 277 App.Div. 108, 98 N.Y.S.2d 69; 301 N.Y. 498, 95 N.E.2d 817; Gordon v. Guernsey, 316 Mass. 106, 55 N.E.2d 27; Scott on Trusts, § 188.4."
267 F.2d at 134.
This Court reached a comparable decision in a similar case, Troy Bank & Trust Co. v. Brantley, 263 Ala. 428, 82 So.2d 618 (1955). In Brantley, this Court held as follows:
"Theoretical confusion is compounded by those cases that enunciate the rule that a party may recover attorneys' fees from the estate for the construction of an ambiguous will where the suit is instituted merely for the purpose of securing a construction of the will; but attorneys' fees will be denied where the heir attempts to obtain something for himself by a will construction which he advocates. [Citations omitted.] The rationale of these cases is supported by neither reason nor logic. These courts assume that the world is populated by kindhearted heirs with gold-lined purses who altruistically institute costly suits for the sole purpose of being of aid and assistance to others. While this assumption would do credit to mankind, it overlooks the realities of human nature in our highly commercialized society. Few suits for the construction of trusts would be instituted if the party bringing them did not hope to personally gain from the prevalence of his contentions. The statements in these cases seem to be directly in conflict with pronouncements from the same jurisdictions that the hope of personal benefit by the party instituting the suit does not determine the propriety of the allowance of fees out of the estate." *60 263 Ala. at 435-36, 82 So.2d at 624-25 (emphasis in original).
From the inception of this lawsuit, the Operatives have sought to defend rights and interests which were essential to the functioning of the Eagan Trust. The original complaint filed on May 17, 1983, set forth the interests of the trust which were at stake in the unilateral discharge of one trustee by another. The complaint states, in pertinent part:
"[15.] ... Plaintiffs further aver that unless this Court grants relief requested to protect the plaintiffs from the intimidation and harassment to which they are now subject that neither the plaintiffs nor any other employees of ACIPCO who might be elected to the Board of Operatives will have the necessary freedom from fear of discharge from employment at ACIPCO to adequately and properly perform their duties as a trustee under the Eagan Trust .... The Board of Operatives charge that having failed to successfully oppose the election of its six recently re-elected members, the Board of Management and the Board of Directors have now taken the drastic step of discharging from employment all of the members of the Board of Operatives in an effort to protect themselves from the efforts of the Board of Operatives to discharge its duties under the terms of the Eagan Trust.
"...
"17. Plaintiffs aver that the Board of Management, through its domination and control of the Board of Directors of ACIPCO, arranged for all members of the Board of Operatives to be discharged in an effort to protect themselves from possible liability for money damages which would result from the Board of Operatives bringing legal action based on the findings of the Dudley, Hopton-Jones, Sims & Freeman report. The Board of Directors, dominated and controlled by the Board of Management, acted illegally ... in attempting to discharge the Co-Trustees of the Eagan Trust, said Trust being the owner of all the outstanding common capital stock of ACIPCO, so that the Board of Management alone could absolutely dominate control [of] ACIPCO in violation of the terms and conditions of the Eagan Trust.
"18. The plaintiffs aver that the purpose of the Board of Directors in discharging the Board of Operatives was to punish the members of said Board of Operatives for attempting to discharge its duties as Co-Trustees of the Eagan Trust and to intimidate and harass the members of the Board of Operatives as the elected representatives of the employees of ACIPCO.
"19. Plaintiffs aver that the Board of Directors is without authority to discharge the members of the Board of Operatives.
"....
"21. The plaintiffs aver that the Board of Directors in violation of the By-Laws of ACIPCO and in violation of the principles of law and equity have declared the Board of Operatives to be vacant and have called a special election to elect another Board of Operatives. Plaintiffs aver that the Board of Directors is without authority to take such action. Plaintiffs further aver that management, having failed to defeat the six members of the Board of Operatives in the last election, has taken the drastic actions outlined above in order to place its candidates on the Board of Operatives through intimidation of the other employees of ACIPCO. Plaintiffs aver that they are suffering and will continue to suffer irreparable harm and injury, that ACIPCO is suffering and will continue to suffer irreparable harm and injury and that the beneficiaries of the Eagan Trust are suffering and will continue to suffer irreparable harm and injury unless this Court restrains and enjoins the Board of Directors from such illegal and wrongful activity and restores the plaintiffs to their jobs as employees of ACIPCO and as members of the Board of Operatives."
The members of the Board of Operatives were not merely attempting to protect *61 personal interests in seeking reinstatement, but, in addition, were seeking protection against removal by the Board of Management for exercising discretion in a manner which they claimed was in the best interests of the entire trust. If management had been able to fire the Board of Operatives for their activities, then no other employee trustee would feel free to question or challenge the conduct of the Board of Management trustees, and the beneficiaries would have been left without the employee representation that Mr. Eagan made an integral part of the trust.
Here, we find that the learned trial judge erred and that the Operatives are entitled to attorneys' fees pursuant to Code 1975, § 34-3-60[3] and pursuant to the indemnification guarantee contained in the bylaws of ACIPCO.
This case clearly involves the administration of a trust and, therefore, comes within the provisions of § 34-3-60. In Ingalls v. Hare, 266 Ala. 221, 96 So.2d 266 (1957), one group of trustees attempted to remove another group of trustees from their status as trustees. The effort at removal failed and the trustees who were the object of the effort were held entitled to fees for defending themselves against it and retaining themselves in office. This Court found that "the successful defense of the several trustees who were before this court in the removal cases redounded to the benefit of the trusts involved and that such defense was made in good faith," and held, therefore, that "the trial court did not err in ordering that counsel who represented these trustees be compensated for their services out of the trusts [pursuant to Code 1940, Title 46, § 63]." 266 Ala. at 227-228, 96 So.2d at 273. It will be noted that Code 1940, Title 46, § 63, is the predecessor to Code 1975, § 34-3-60.
In addition, we find that the Operatives are entitled to attorneys' fees pursuant to the indemnification provisions of ACIPCO's bylaws. Article IV-A of the bylaws provides as follows:
"Section 1: This Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that he is or was
"(a) a Director of the Company;
"...
"(d) a member of the Board of Operatives of the Company
"(e) a member of the Board of Trustees under the codicil of the will of John J. Eagan;
(those so indemnified being sometimes hereinafter in this Article IV-A described as `indemnified parties' or an `indemnified party' or a `person indemnified', against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in a manner *62 which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.
"Section 2:
"The Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact he is or was a Director or Officer of the Company, or other indemnified party against expenses (including attorneys' fees), actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of his duty to the Company unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper."
Moreover, Section 3 of Article IV-A of the bylaws makes it clear that success by one indemnified, in and of itself, entitles the successful party to indemnification without more:
"To the extent that a person under this Article has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in the first or second sections of this Article, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith." (Emphasis supplied.)
The Board of Management contends that the Operatives are not entitled to attorneys' fees pursuant to the indemnity provisions, arguing that the indemnity provisions provide indemnification only to defendants in a lawsuit, not to plaintiffs. We disagree.
The requirements for indemnification set forth in the above sections are as follows: (1) Membership on the Board of Operatives, Board of Trustees, or Board of Directors; (2) status as a "party" to a civil action because of membership on one of such Boards; and, (3) action in a manner that is reasonably believed by the indemnified party "to be in or not opposed to the best interests of the Company."
Here, the Operatives, as plaintiffs, had to resort to the courts in order to defend themselves against what the trial court found, and we find, was the wrongful action of the Board of Directors. Thus, we hold that they are entitled to attorneys' fees as provided for in the indemnity provisions of the ACIPCO bylaws. Accordingly, we reverse the trial court's judgment on the issue of attorneys' fees and direct that court on remand to determine the fair and reasonable attorneys' fees and costs incurred by the Operatives, in the trial court and in this Court, in protecting their rights and duties as trustees of the Eagan Trust and to award such fees to the Operatives.
83-494-AFFIRMED.
83-543-REVERSED AND REMANDED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.

ON APPLICATION FOR REHEARING
MADDOX, Justice.
OPINION MODIFIED; REHEARING DENIED.
TORBERT, C.J., and JONES, SHORES and BEATTY, JJ., concur.
NOTES
[1] The relevant provisions of this trust are as follows:

1. The voting stock of Acipco was left in trust to the Board of Trustees composed of the Board of Operatives and the Board of Management.
2. The Board of Trustees was to do the following:
(a) Receive dividends paid on the stock and use it, within their discretion, to insure a living wage to all employees.
(b) Use the dividends, in their discretion, to aid employees and their wives and children in times of shutdown of the plant, illness, or unavoidable layoff of employees.
(c) To vote the stock at stockholders meetings.
(d) To be trustees for employees and persons requiring the product of the company. The codicil closes with this direction by Mr. Eagan:
"The trustees, appointed by this codicil, in accepting the trust and acting hereunder will be trustees both for said employees and said persons requiring the product of said company. It is my will and desire that said trustees in the control of said company, through the control of said common stock, shall be guided by the sole purpose of so managing said company as to enable said American Cast Iron Pipe Company to deliver the company's product to persons, requiring it, at actual cost, which shall be considered the lowest possible price consistent with the maintenance and extension of the company's plant or plants and business and the payment of reasonable salaries and wages to all employees of said company, my object being to insure `service' both to the purchasing public and to labor on the basis of the Golden Rule given by our Lord and Savior Jesus Christ."
[2] The required oath is as follows:

"We, the undersigned, do hereby accept membership on this Board of Trustees under the Codicil to the Will of John J. Eagan, with a full knowledge of the provisions of his codicil, copy of which is reproduced above.
"In accepting this position of trust, we declare ourselves to be in full sympathy with the broad scope of its purposes, and acknowledge our belief in Jesus Christ, and the practical application of His teachings to industrial problems and progress.
"It shall be our irrevocable purpose so to demean ourselves in this office that the management of this trust shall be in the spirit of John Eagan: that the principles set forth in this codicil shall be the rule and guide to our conduct of the affairs entrusted to us, to the end that this institution shall be preserved and shall render `service' both to the purchasing public and to labor on the basis of the Golden Rule given by our Lord and Savior, Jesus Christ."
[3] "In all actions and proceedings in the probate courts and circuit courts and other courts of like jurisdiction, where there is involved the administration of a trust, or where there is involved the sale of property for distribution, or where there is a partition in kind of real or personal property between tenants in common, the court having jurisdiction of such action or proceeding may ascertain a reasonable attorney's fee, to be paid to the attorneys or solicitors representing the trust, joint or common property, or any party in the action or proceeding, and is authorized to tax as a part of the costs in such action or proceeding such reasonable attorney's fee, which is to be paid when collected as the other costs in the proceeding to such attorneys or solicitors as may be directed or ordered by the court and to be a lien on the several parts in case of partition in kind."