These four cases were consolidated on appeal. They arise from controversies between *Page 530 
the two boards that comprise the board of trustees of the trust established by the codicil to the will of John J. Eagan. The two boards are the Board of Operatives and the Board of Management.[1] The res of the trust is the American Cast Iron Pipe Company ("ACIPCo"). In a previous decision arising out of another controversy between these two boards, Farlow v. Adams,474 So.2d 53 (Ala. 1985), this Court set out a brief explanation of the components of the Eagan trust and ACIPCo, which we quote here in order to provide a backdrop for an understanding of the various bases for the present controversies:
 "ACIPCo is a Georgia corporation with its principal place of business in Jefferson County, Alabama. . . . All shares of common stock in ACIPCo are held in trust for the benefit of ACIPCo employees according to the provisions contained in the will of John J. Eagan.[*] Under the terms of the trust, the Board of Operatives, which consists of twelve elected ACIPCo employees, is charged, along with the Board of Management, with the duties of trustees. Two members of the Board of Operatives are elected to serve on the Board of Directors.
 "The Board of Management consists of the corporate officers of ACIPCo. The Board of Management also constitutes the Executive Committee of the Board of Directors.
 "According to the trust agreement, dividends are paid to the Board of Management and the Board of Operatives as the trustees of the employees, and the dividends are invested by the trustees to insure that each employee is provided an income which, together with the wage or salary, will insure a living wage to all employees.
 "The Board of Operatives and the Board of Management have disagreed for several years over their respective roles, and the disputes have centered on the desire of the Operatives to establish a stronger voice in company decisions.
 "[*] [Footnote 1] The relevant provisions of this trust are as follows:
 "1. The voting stock of Acipco was left in trust to the Board of Trustees composed of the Board of Operatives and the Board of Management.
 "2. The Board of Trustees was to do the following:
 "(a) Receive dividends paid on the stock and use it, within their discretion, to insure a living wage to all employees.
 "(b) Use the dividends, in their discretion, to aid employees and their wives and children in times of shutdown of the plant, illness, or unavoidable layoff of employees.
"(c) To vote the stock at stockholders meetings.
 "(d) To be trustees for employees and persons requiring the product of the company. The codicil closes with this direction by Mr. Eagan:
 " 'The trustees, appointed by this codicil, in accepting the trust and acting hereunder will be trustees both for said employees and said persons requiring the product of said company. It is my will and desire that said trustees in the control of said company, through the control of said common stock, shall be guided by the sole purpose of so managing said company as to enable said American Cast Iron Pipe Company to deliver the company's product to persons, requiring it, at actual cost, which shall be considered the lowest possible price consistent with the maintenance and extension of the company's plant or plants and business and the payment of reasonable salaries and wages to all employees of said company, my object being to insure "service" both to the purchasing public and to labor on the basis of the Golden Rule given by our Lord and Savior Jesus Christ.' "
474 So.2d at 54-55.
In Farlow v. Adams, this Court held that members of the Operatives could not be fired without cause. We explained: *Page 531 
 "The ability of the Board of Directors of ACIPCo, dominated and controlled by the Board of Management, to arbitrarily and unilaterally discharge the employee trustees of the Eagan Trust, the Board of Operatives, would clearly result in the Board of Management's having unbridled and absolute power over the trust estate. We cannot construe the Eagan Trust to vest in management this power[,] . . . [and] we must conclude that Mr. Eagan intended that the Board of Operatives could be discharged only for cause. A contrary holding would allow the Board of Management unlimited control and would totally disregard Mr. Eagan's intent and purpose in creating the trust. Consequently, we agree with the trial court's order which reinstated the employees who were members of the Board of Operatives."
474 So.2d at 58.
As the foundation for their various requests for relief in these consolidated cases, the Operatives contend that Management has attempted to ignore and circumvent this Court's decision in Farlow v. Adams, supra, and find other ways to dominate the trust. Additional facts specific to each appeal will be discussed in turn.
 I. 85-300 Adams v. Farlow
The facts pertinent to this appeal are as follows:
In early December 1984, E.E. Langner, ACIPCo's works manager and also a member of Management and the Board of Directors, issued a memorandum addressed to the Operatives concerning the enforcement of Plant Rule 12, which prohibits ACIPCo employees from "quitting work, leaving assigned work area, . . . or leaving during working hours without permission from immediate supervisor." In his memorandum to the Operatives, Langner stated the following:
 "In order that we do not have any misunderstanding about Plant Rule # 12, I offer the following clarification.
 "Any employee must have permission to leave the plant while on Company time. Merely telling your supervisor that you are going to town or going to see your lawyer does not mean that you are granted permission to leave. The reason for needing to leave the plant must be given in order for any supervisor to make a logical decision on whether permission should be granted or not.
 "In the case of members of the Board of Operatives, if their supervisor or superintendent does not feel that he has sufficient reason to okay the Board Member leaving the plant, then the Board Member must obtain permission from Glenn Hicks, the Works Manager, or Assistant Works Manager.
 "Plant Rule # 12 will be enforced in the future."
Apparently from the time of this memorandum and up until August 30, 1985, all of the Operatives abided by Plant Rule 12. The Operatives do not dispute Management's contention that the Operatives were never denied permission to leave the plant during their working hours to see their attorney; that no one ever inquired about the Operatives' reason or purpose for going to see their attorney; and that the Operatives were always able to perform their duties as Operatives and as trustees without violating this or other plant rules.
In August 1985, the Operatives learned that ACIPCo had hired, or was planning to hire, temporary contract labor from Manpower, Inc. Because the Operatives were of the opinion that the employment of contract labor was in violation of the Eagan trust, three of the members of the Operatives requested Carl P. Farlow, in his capacity as chairman of the board of trustees, to call a special trustees meeting for the purpose of discussing ACIPCo's use of contract labor. Farlow refused because he did not think that the use of Manpower, Inc., fell within the province of the board of trustees. Farlow also assured these Operatives that no Manpower, Inc., workers would work 40 hours a week if any ACIPCo employee was working less than 40 hours a week.
After Farlow refused to call a special meeting, several Operatives members orally requested the vice chairman of the board of trustees, Leland Adams, to call the *Page 532 
meeting. The rules and regulations governing the board of trustees, which are included in the by-laws of ACIPCo as Article VII, provide at Section 3 the procedure for calling a special trustees meeting:
 "Special meetings of the Board may be called at any time on three days' notice to all of the members of the said Board, which said notice may be verbal or in writing, and shall state the time and place of holding of the meetings. . . . The call shall be made by the Secretary, at the instance of the Chairman, or, in his absence or inability to act, at the instance of the Vice Chairman. In the event that the Chairman should refuse or fail, or in his absence or inability to act, the Vice Chairman should be absent, or refuse
or fail upon written request of a majority of the members of either the Board of Operatives or the Board of management to make the call, then the meeting may be called at the instance of a majority of the members of either of said Boards, but such call must be in writing, stating the time and place of meeting, and given to each member of the Board of Trustees at least ten days prior to the meeting, and no business other than that specified in the call shall be considered at such meeting."
(Emphasis added.)
On August 16, 1985, after Adams also refused to call the meeting, a majority of the Operatives, acting under the above provision, issued a written call for a special trustees meeting to be held on August 27, 1985. When Farlow received his notice of this meeting, he then instructed the secretary of the board of trustees to call a special meeting for August 23, 1985, four days prior to the meeting called by the Operatives. Upon receiving notice of the August 23 meeting, two of the Operatives, Adams and Bradford, went to the secretary, P.W. Green, and asked for an agenda of the meeting called by Farlow. Green explained that there was no agenda but told them that he presumed the purpose of the meeting was to discuss the contract labor issue.
At the August 23 meeting, Farlow told the Operatives that the meeting was called in response to their request for a meeting, and he took the position that the August 27 meeting called by the Operatives was improper because it had not been called in accordance with the by-laws. Farlow's interpretation of the portion of the by-laws quoted supra required the Operatives to submit their request in writing to Adams, the vice-chairman, upon Farlow's refusal to call the meeting. The Operatives disagreed and explained that they were not then prepared to discuss the contract labor issue because, for example, they had not prepared the resolutions they planned to introduce. Farlow told the Operatives that there would not be an August 27 meeting, and that Management would not attend any meeting the Operatives attempted to conduct.
The Operatives assembled on August 27 for the trustees meeting they had called. None of the members of Management were present. Several of the Operatives attempted, but were unable, to find any of the members of Management and were informed that Farlow was away from the plant and that all the others were out of town. The Operatives proceeded with their trustees meeting and passed the following resolution:
 "Be it resolved that the Board of Trustees of the John J. Eagan Trust, as codicil to the will of John J. Eagan, deceased, established that John J. Eagan Trust prohibits the American Cast Iron Pipe Company while owned by and administered under the terms and conditions of that trust, except as this Board of Trustees may from time to time agree in emergency or unforeseen circumstances, from utilizing any labor in the production of any goods produced and sold by the American Cast Iron Pipe Company, except as is provided by those persons who are employed by American Cast Iron Pipe Company and are beneficiaries of the John J. Eagan Trust.
 "The Board of Trustees does hereby resolve that the use of contract labor, whether provided by an entity engaged in the provision of contract labor as a *Page 533 
legal business or otherwise, is contrary to the provisions of the John J. Eagan Trust and is prohibited by the terms and conditions thereof except as to professional services provided by professional persons.
 "Be it further resolved that the Board of Trustees does hereby appoint as a Labor Problem Management Committee of the Board of Trustees the following members of the Board of Trustees: Leland C. Adams, Jr., Chairman, Carl P. Farlow, Vice Chairman, James Frederick, Gary Bradford, Richard Bragdon.
 "The Board of Trustees hereby further directs the aforesaid committee to immediately inform Manpower, Inc. that all contract labor presently provided by Manpower, Inc. for use in American Cast Iron Pipe Company is to be immediately removed from the premises, and any and all contracts or agreements signed or otherwise entered into by American Cast Iron Pipe with Manpower, Inc. are immediately cancelled.
 "The committee is further authorized to make payment of any sum now due, and to negotiate with Manpower the payment of any penalties that may be due under the terms and conditions of any contract or agreement entered into between Manpower, Inc. and American Cast Iron Pipe Company.
 "Be it further resolved by the Board of Trustees that the aforesaid committee is directed to meet at the call of the Chairman and to draw up and approve, by majority vote of the members of the committee, the chairman having the full right to vote, rules and regulations for the recall of former employees or laid-off employees of American Cast Iron Pipe Company to perform such work as American Cast Iron Pipe Company may from time to time require, that in the absence of recall of such former employees or laid-off employees of American Cast Iron Pipe Company might otherwise be performed by contract labor. The rules and regulations so adopted by a majority vote of the aforesaid committee shall be final and binding unless the Board of Operatives and the Board of Management members of the Board of Trustees shall unanimously vote to change or alter all or some of the rules and regulations drawn up and adopted by the aforesaid committee.
 "Be it further resolved that the Board of Trustees does hereby forever prohibit American Cast Iron Pipe Company from employing contract labor for any purpose whatsoever and does direct that all labor provided to American Cast Iron Pipe Company, except for professional labor such as is provided by attorneys, accountants, doctors, nurses, and persons in recognized professions, shall be provided by employees of American Cast Iron Pipe Company. . . ."
The resolution went on to provide that the prohibition against using contract labor at ACIPCo would also apply to any wholly-owned subsidiaries of ACIPCo as soon as practicable.
On Friday, August 30, 1985, three days after the August 27 meeting, Adams had an appointment scheduled with the Operatives' attorney to prepare the necessary letters to be delivered to Farlow and the other committee members informing them of the above resolution. Early that morning, Adams asked his supervisor, Bert Bowlin, for permission to leave the plant during his working hours to see the Operatives' attorney. According to Adams, Bowlin gave him permission to leave. Bowlin, however, testified that he did not give Adams permission, and that since the December 7, 1984, memorandum (quoted supra), he had required Adams to obtain permission from Langner, the works manager. Adams testified that he did go to Langner's office to see him or one of his assistants about leaving the plant, but that none of them was present. Adams then went to see Glen Hicks, the personnel director, who was in a meeting. Because he was running late for his 8:00 a.m. appointment, Adams did not wait for Hicks and, instead, asked Hicks's secretary to tell him where he was going and that he could be reached there. When Hicks learned that Adams left the plant without obtaining his permission, he reported it to Langner *Page 534 
around 9:30 a.m. Langner then checked with Bowlin, Adams's supervisor, to see if he had given Adams permission to leave. Upon learning that Bowlin had not given Adams permission to leave, Langner prepared a written reprimand on Adams that same day.
The following Monday was Labor Day, an ACIPCo holiday, so the "workload meeting" between the Operatives and one or more representatives from the works manager's office, which is regularly scheduled to be held every other Monday, was held at noon on Tuesday, September 5, 1985. At that meeting, Langner presented to each of the Operatives a written memorandum, set out below, concerning a change in the compensation to Operatives members for attending special Operatives meetings:
"September 5, 1985
"TO: MEMBERS OF THE BOARD OF OPERATIVES
 "I am sure that you are aware that the plant has failed to produce any profit this year through July. In an effort to reduce costs we have made economies in operating procedures and use of materials.
 "Most of our employees have taken up the slack, assumed extra duties and have done an excellent job of decreasing manhours per ton of product. At the same time we have made significant improvements in the quality of our products. I am extremely grateful to these employees for their efforts. However, we are still not in a good cost position and must continue to work hard at reducing our manufacturing costs.
 "As a part of this cost reduction program, I call your attention to Article VI, Section IV, of the 'Rules and Regulations of the Board of Operatives,' adopted by the Board of Operatives on July 14, 1970. This paragraph, listed in Section B2 of the ACIPCo Policy Manual, clearly states that a member of the Board of Operatives '. . . shall be allowed during his regular working hours such time as may be required to properly attend to the business of the Board of Operatives and his wages or salary or standing in his department shall not be affected by his absence from his regular work for the above reason.'
 "Board members will be compensated for time they are required by the Company to attend committee meetings and investigations, as well as for the regular meeting of the Board on the first Monday of each month whether during regular working hours or not. Pay for special Board meetings not held during regular working hours must be authorized by the Works Manager's office.
 "Since the Board of Operatives in recent years has been allowed to operate outside the boundaries of the Rules and Regulations which they adopted in 1970, time for adjustment will be allowed. We will begin complying with the rules concerning pay with the estimate beginning September 23, 1985. Most of the Board members will realize very little effect from this compliance with the rules.
 "I am also asking the Board of Operatives to please not have more persons than are required in committee meetings, investigations, etc. For instance, on Friday, August 16, there were seven Board members in the meeting investigating a discipline case. There should have been four.
 "One other request is that you please report to your job at starting time. If you are tied up in a meeting, call and let your supervisor know and also let him know when he can expect you on the job so that he can arrange his people to cover for you. Most of you already do this.
"I appreciate your cooperation with the above.
"/s/ E.E. Langner
"E.E. Langner
"Vice President Works Manager"
(Emphasis added.)
Prior to this change, the Operatives did not have to obtain approval in order to be paid for non-scheduled Operatives meetings held before or after their respective regular working hours. The Operatives are paid their "regular shift differential for time charged to Board business during *Page 535 
their normal scheduled work shift and hours." They are paid the first shift rate (apparently a higher rate) for time charged to board business in excess of regularly scheduled work hours. According to Langner, the requirement that overtime pay for non-scheduled meetings be authorized was imposed in response to alleged abuses by some of the Operatives, which he had either witnessed or which had been reported to him, resulting in excessive amounts of overtime claimed by the Operatives.
At the conclusion of the September 3 workload meeting, Langner told Adams to report to Langner's office at 1:30 p.m. Adams went to Langner's office at 1:30 p.m. as directed, accompanied by another member of the Operatives. Hicks, the personnel director, was also present. At this meeting, Langner informed Adams that he was being given a writen reprimand for violating Plant Rule 12 on August 30, 1985, by leaving the plant without permission. Langner read the reprimand to Adams but did not give him a copy.
On that same day, September 3, 1985, Farlow wrote Adams a letter in response to Adams's letter informing Farlow of the resolution passed by the Operatives acting as the board of trustees at their August 27 meeting which Management refused to attend. In this letter, set out in pertinent part below, Farlow once again disavowed and disaffirmed the validity of any of the actions taken by the Operatives purportedly acting as the board of trustees at the August 27 meeting, because he contended the meeting was improperly called and a quorum was not present:
"Dear Lee:
 "This is in reply to your letter to me of August 30, 1985.
 "As pointed out in the meeting of the Board of Trustees held on Friday, August 23, at which you were present, the attempted call of a meeting for August 27 was ineffective for failing to comply with Section 3 of Article VII of the Rules and Regulations of the Board as set out in the By-Laws of the Company and no meeting could be held pursuant to it. Consequently, no valid action could have been taken. Furthermore, even if a meeting had been properly called, no action could have been taken since a quorum was not present.
 "As you know, the meeting called by the Secretary at my instance as Chairman of the Board of Trustees for August 23 was for the purpose of considering the use of contract labor, the matter referred to in the ineffective call of a meeting for August 27. This was done to accommodate the desire of the majority of the Board of Operatives to consider this matter and for a time when the members of the Board of Management could be present. At the August 23 meeting the Board of Operatives then stated they were not prepared to discuss the matter, but would be prepared to do so at a meeting on August 27. It was pointed out that a meeting could not and would not be held on August 27 pursuant to the defective call, but that another meeting for that purpose could be held later upon a proper call.
 "The resolution attached to your letter of August 30 has not been adopted by the Board of Trustees and is of no effect. So that there will be no misunderstanding, I want to make it clear that any action taken by any person purporting to act on behalf of American Cast Iron Pipe Company based on that resolution will be without proper authority and in direct disobedience thereof, and will be interfering with lawful business relationships of the Company.
 "If the Board of Operatives wishes to present such a resolution to a properly called meeting of the Board of Trustees with a quorum present, it is, of course free to do so. In fact, as Chairman of the Board I will be willing to direct the Secretary to call such a meeting at a mutually convenient time if you wish me to do so.
"Yours very truly,
"/s/ Carl P. Farlow
"Carl P. Farlow"
(Emphasis added.)
The Operatives contend that the phrase "without proper authority," included in the *Page 536 
sentence emphasized above, is in reference to Plant Rule 6, which prohibits "[d]isobedience to proper authority," the minimum penalties for which include: reprimand for a first offense; two-week layoff for a second offense; and discharge for a third offense.
Responding to what it perceived to be threats of punitive actions against them by Management, the Operatives filed a motion in this case on September 16, 1985, seeking a temporary restraining order and temporary and permanent injunctive relief.[2] Specifically, the Operatives asked the trial court to grant the following relief:
 "23. Immediately issue a temporary restraining order against the defendants Farlow, Green, Doughty, Bragden and Langner providing as following:
 "(a) Restraining the said defendants from requiring the plaintiffs to obtain permission to leave the Acipco premises to consult with the attorney for the Board of Operatives and from imposing reprimands or any other form of discipline in connection therewith;
 "(b) Directing the immediate removal of the reprimand of 3 September from the record of plaintiff Adams;
 "(c) Restraining the defendants from enforcing the provisions of the 3 September letter from the defendant Langner to the Board of Operatives and directing that the Board of Operatives shall have the right to meet at the call of its chairman and to perform necessary board business without permission from any other persons and that the members of the Board of Operatives shall be paid for all time spent in attending such meetings and board business;
 "(d) Restraining the defendants from interfering with the plaintiffs or any of them acting to perform the full and complete requirements of the resolution adopted at the 27 August meeting of the Board of Trustees or imposing or attempting to impose any discipline on any of the plaintiffs acting in accordance with such resolution;
 "(e) Restraining the defendants from imposing on the plaintiffs any restrictions or limitations not imposed in practice prior to 3 September 1985;
 "(f) Restraining the defendants from disciplining, harassing or intimidating the plaintiffs until further order of this Court;
 "(g) Restraining the defendants from violating their duties as trustees of the Eagan Trust to act solely in accordance with the law of Alabama in protesting or challenging the conduct of the plaintiffs as trustees of the Eagan Trust in the management and control of Acipco.
". . . .
 "25. Issuing a permanent injunction in accordance with the foregoing upon a hearing on the merits."
By an order dated September 17, 1985, the trial court denied the Operatives' request for a temporary restraining order. Following a ten-day trial and the submission of briefs by both parties, the trial court entered a rather lengthy order on December 6, 1985, denying the Operatives' motion forpreliminary injunction.[3] It is from this order that the Operatives appeal.
In Howell Pipeline Co. v. Terra Resources, Inc.,454 So.2d 1353, 1356 (Ala. 1984), this Court set out a three-pronged *Page 537 
test by which the trial court can review an application for a preliminary injunction:
 "1. '. . . if [the trial judge] finds that the party has presented a fair question as to the existence of the right to be protected, and further finds that temporary interference to preserve the status quo is convenient and expedient, then he may exercise his discretion and grant the injunction.'
 "2. '. . . An injunction should not be granted unless it is necessary to prevent irreparable injury.'
 "3. 'Injunctions . . . will not be granted merely to allay apprehension of injury; the injury must be both imminent and irreparable in a court of law.'
 "Double C. Productions, Inc. v. Exposition Enterprises, 404 So.2d 52, 54 (Ala. 1981). 'In measuring the relief sought by a complainant against this standard, the trial court, then, in its discretion and under the individual facts and circumstances of each case, ". . . may consider and weigh the relative degree of injury or benefit to the respective parties. . . ." ' Id., citing Valley Heating, Cooling and Electric Company v. Alabama Gas Corporation, 286 Ala. [79] at 82, 237 So.2d [470] at 472 [(1970)]."
Additionally, as recently recognized by this Court inMarshall Durbin Co. of Jasper, Inc. v. Jasper UtilitiesBoard, 483 So.2d 399, 400 (Ala. 1986):
 "Equally important is the proposition stated by this Court in Alabama Education Association v. Board of Trustees of the University of Alabama, 374 So.2d 258 (Ala. 1979):
 " 'Furthermore, the law in this State is settled that, on a motion for preliminary injunction, the burden is on complainant to satisfy the court that there is at least a reasonable probability of ultimate success on the merits of the controversy. Postal Telegraph v. City of Mobile, 179 F. 955 (C.C.S.D.Ala. 1909).'
"374 So.2d at 261."
A party appealing from the grant or denial of a motion for a preliminary injunction also bears a heavy burden because a trial court's decision to grant or deny a motion seeking a preliminary injunction will not be disturbed on appeal, absent a gross abuse of discretion. Marshall Durbin Co. of Jasper,Inc., supra; Howell Pipeline Co., supra. This gross abuse of discretion must be such as to result in manifest injustice unless this Court sets aside the trial court's order.
Having reviewed the record in this case, along with the respective briefs and arguments of counsel for both sets of parties, we cannot say the trial court grossly abused its discretion in denying the Operatives' request for preliminary injunctive relief. Indeed, as to the "permission to leave rule" issue, the "removal of the reprimand" issue, and the "approval of overtime pay for special Operatives' meetings" issue, we agree with and hereby adopt the order of the trial court:
 "1. The Plaintiffs seek to restrain the Defendants from requiring the Plaintiffs to obtain permission to leave the Acipco premises to consult with the attorney for the Board of Operatives and from imposing reprimands or any form of discipline in connection therewith.
 "The evidence has shown that since at least December 7, 1984, the Plaintiffs have been seeking and requesting permission prior to their leaving the plant premises during their working hours to consult with the Board of Operatives' attorney. Until the incident involving Leland C. Adams, Jr. resulting in a written reprimand to him on September 3, 1985, (discussed later herein), the evidence shows that the Plaintiffs had suffered no difficulty, injury or damage as a result of following the permission procedure. There has been no evidence presented that any of the Plaintiffs have been denied permission to leave the plant premises to consult with their attorney on Board of Operatives business or that any of the Defendants have ever demanded to know or tried to learn the reasons it was necessary for the Plaintiffs, or any of them, to meet with their attorney at a particular time. To the contrary, the evidence has shown that *Page 538 
Plant Rule 12 . . . has been in existence for many years and that the evidence has failed to show that it has been applied unfairly or more restrictively to the Plaintiffs than any other wage employee.
 "2. The Plaintiffs seek the Court to mandatorily direct the immediate removal of the written reprimand of September 3, 1985, from the record of Plaintiff Leland C. Adams, Jr.
 "Whether Adams has shown a fair question to raise as to the existence of a right to relief is borderline and doubtful; however, it is clear and the Court so finds and concludes that Adams has failed to show that he has or is likely to suffer immediate and irreparable injury unless the Defendants are mandatorily ordered to remove by preliminary injunction the reprimand given him on September 3, 1985. The evidence shows that Adams had previously been cited for leaving the plant premises without permission from an authorized person and received a reprimand for such conduct. The evidence shows now that Adams has again been cited for the same violation of the plant rules and has again been reprimanded. Pursuant to the plant rules, Adams could have been fired on either occasion but such has not been the result. At most, Adams has only shown an apprehension of injury and a speculation as to the consequences of future actions by the Defendants.
 "3. The Plaintiffs seek to restrain the Defendants from enforcing the provisions of a letter dated September 3, 1985, of Defendant E.E. Langner, Jr. to the members of the Board of Operatives. This letter states in pertinent part that,
 " 'Board members will be compensated for time that they are required by the Company to attend committee meetings and investigations, as well as for the regular meeting of the Board on the first Monday of each month whether during regular working hours or not. Pay for special Board meetings not held during regular working hours must be authorized by the Works Manager's office.'
 "The Plaintiffs seek the Court's mandatory order preliminarily that the Board of Operatives shall have the right to meet at the call of its chairman and to perform necessary Board business without permission from any person and that the members of the Board of Operatives shall be paid for all time spent in attending such meetings. The evidence shows that this claim apparently seeks the result that one or more of the Plaintiffs, as members of the Board of Operatives, be paid overtime for any special Board meetings called and held at a time that the Board member or members are not on duty during their regular shift or working hours and to further be paid overtime at any time an individual Board member considers it necessary to perform necessary Board business during times not during regular working hours.
 "The letter and policy complained of clearly applies only to overtime compensation of Board members for attending special meetings of the Board of Operatives and does not attempt to or purport to regulate or control when the Board of Operatives may choose to meet. Neither has there been any evidence presented that any of the Defendants attempted to dictate or interfere with the right to hold such meetings or the timing of them."
As to the Operatives' request that Management be restrained from interfering with the Operatives' attempts to implement the contract labor resolution passed on August 27, 1985 (quotedsupra), we agree with the trial court that the Operatives are not entitled to the issuance of a preliminary injunction as to this matter because they have failed to establish that imminent and irreparable injury will result if the injunction is not issued. However, we do not agree that this claim "fails to show a fair question to raise as to the existence of a right to relief," which is, nevertheless, only one of several factors to be considered. In the portion of its order dealing with the resolution, the trial court stated the following:
 "The resolution has been shown to be of doubtful validity. It was adopted by some of the trustees comprising only one *Page 539 
voting unit of the trust, to-wit, the members of the Board of Operatives. This procedure is not authorized by the codicil creating the trust or the by-laws of the company. The evidence shows that the purported meeting of the Board of Trustees was not properly called or noticed. Further, that the action taken by the trustees present at the meeting held on August 27, 1985, and now sought to be sanctioned by this Court, was outside of the stated purpose set forth in the defective notice of the meeting. It is further clear that the subject matter of the resolution is beyond the power and authority of the trustees and an invasion of the management prerogatives of the Board of Directors of the company or possibly the prerogatives properly exercised by the stockholders of the company."
(Emphasis added.) Based on our reading of the clear language of Article VII, Section 3, setting forth the procedure for calling a special trustees meeting, we cannot agree with the trial court's preliminary finding that the meeting was not properly called. However, the error of this preliminary finding by the trial court does not compel reversal because of the narrow issue here presented.[4]
Management argues that Article VII, Section 3, requires that when the chairman of the board of trustees refuses to call a special meeting, as he did in the present case, a majority of either board must submit to the vice chairman a written request
to call a special meeting, upon which he must refuse or fail to act before a majority of that board may call the meeting themselves. This construction of Section 3 does not comport with the plain language of that provision. As the following pertinent sentences make clear, resort to the vice chairman by a majority of either board is required only in the absence of the chairman or his inability to act:
 "The call shall be made by the Secretary, at the instance of the Chairman, or, in his absence or inability to act, at the instance of the Vice Chairman. In the event that the Chairman should refuse or fail, [or in his absence or inability to act, the Vice Chairman should be absent, or refuse or fail upon written request of a majority of the members of either the Board of Operatives or the Board of Management to make the call], then the meeting may be called at the instance of a majority of the members of either of said Boards."
(Brackets and emphasis added.) The bracketed portion of the second sentence above is sub-disjunctive; that is, applicable only in the event of the second contingency expressed,viz., the chairman's absence or inability to act. Thus, in the present case, where the chairman refused, it was unnecessary for a majority of the Operatives to submit to the vice chairman
a written request to call a special meeting before they could make the call themselves.
We reserve opinion as to the correctness of the other preliminary "findings" of the trial court with respect to the validity of the resolution passed by the Operatives in their capacity as the board of trustees. The evidence on these issues should be fully developed upon a consideration of the merits of the Operatives' complaint seeking a preliminary injunction.
Based on the foregoing, the order of the trial court denying the Operatives' motion for preliminary injunction is due to be affirmed.
 II. 85-448 Adams v. ACIPCo
This case, also an appeal from the denial of a motion for preliminary injunction, involves the validity of the actions taken at a December 4, 1985, meeting of the ACIPCo Board of Directors. Underlying the Operatives' attack on the validity of those actions is their contention that the board of directors was improperly constituted on December *Page 540 
4, 1985, and, therefore, that any actions taken by the board during the directors' meeting held that day were without force and effect.
Because the proper composition of the ACIPCo board of directors, both in number and respective positions, is at the heart of the factual inquiry in this case, we set out below the pertinent provisions of the ACIPCo by-laws regarding the number of directors as well as the provisions pertaining to the various seats on the board:
"ARTICLE IV
"Directors
"Section 1:
 "The Board of Directors shall consist of not less than twelve nor more than seventeen members. The Directors shall be elected by the holders of the common stock at the annual stockholders' meeting. Vacancies occurring in the Board of Directors between the annual meetings shall be filled only by the common stockholders.
". . . .
"Section 5:
 "A majority of the members of the Board of Directors shall constitute a quorum. . . .
". . . .
"ARTICLE VII
"Board of Trustees
". . . .
Section 14:
 "All shares of common stock of American Cast Iron Pipe Company owned by this Board of Trustees shall be voted at the election of Directors of American Cast Iron Pipe Company as follows:
 "Not less than five nor more than seven Directors who shall be members of the Board of Management of the Company;
 "Two Directors who shall be the members of the Board of Operatives;
 "One Director who shall be a member of the clerical force of the Company;
 "One Director who shall be an employee from the Company organization at large;
 "One Director who is neither an officer nor an employee of the Company, but who shall be selected as one who can fairly represent invested capital;
 "One Director who is neither an officer nor an employee of the Company, but who shall be selected as one who can fairly represent the buying public;
 "One Director who is neither an officer nor an employee of the Company, but who shall be selected as one who can fairly represent the religious, social and educational life of the country; and
 "In addition, the Board of Trustees may elect three additional Directors as hereinafter provided:
". . . .
 "In determining the persons for whom said shares of common stock shall be voted for the remaining Directors, the Board of Management shall cast one vote and the Board of Operatives shall cast one vote, and should said votes not be voted for the same person, then the question in dispute shall be referred to the Board of Directors as provided in Section 12 of this article.
 "Should the Board of Directors of the Company elect one of its members to function exclusively as Chairman of the Board of Directors, then said shares of common stock shall be voted for said person for the fifteenth Director of the Company.
 "Should the Board of Directors of the Company elect one of its members to function exclusively as Technical Director, then said shares of common stock shall be voted for said person as the sixteenth Director of the Company.
 "The fifteenth Director shall not be elected unless the Board of Directors shall elect one of its members as Chairman of the Board of Directors, and the sixteenth Director shall not be elected unless the Board of Directors shall elect one of its members as a Technical Director.
 "If the by-laws of the Company permit, there may be elected a Director in *Page 541 
addition to those above provided, who shall be the seventeenth Director."
(Emphasis added.)
The recent history of the composition of the ACIPCo board of directors, including the facts pertinent to this controversy, is undisputed and is set out by the trial court in its order, which we incorporate with additional facts:
 "The evidence has shown that at the annual meeting of the stockholders of ACIPCO on January 29, 1982, Carl P. Farlow, Paul W. Green, Richard M. Bragdon, S.F. Carter, J.G. Foshee, Harvey Henley, J.A. Sloan, H.L. Brown, Dr. C.C. Fargason, W.E. Snow, Allen Post, W.R. Eagan, and John M. Harbert, III, were unanimously elected as the directors of ACIPCO. [At this January 29 meeting, W.E. Snow was also elected to the position of Technical Director.] Subsequent to that meeting, E. E. Langner was elected to replace S.F. Carter, Nick Johnson was elected to replace Harvey Henley, and J.A. Bragan was elected to replace H.L. Brown. The annual meeting of the Board of Trustees and the annual meeting of the stockholders for 1983 were adjourned for lack of a quorum, in that the Board of Operatives as one of the joint trustees and one of the stockholders did not attend either of said meetings. At the annual meeting of the stockholders on January 23, 1984, the stockholders [including the Operatives] unanimously reelected as directors C.P. Farlow, P.W. Green, R.M. Bragdon, S.F. Carter, J.P. Doughty, Nick Johnson, J.A. Sloan, J.A. Bragan and W.E. Snow. Dr. C.C. Fargason, Allen Post, W.R. Eagan and John M. Harbert, III carried over and continued to serve as directors. At the annual meeting of the stockholders on January 29, 1985, no one was elected to fill any position as a director, and all of the directors carried over and continued to serve and act as directors. In February, 1985, Dr. C.C. Fargason, who had been serving as the director who was an employee from the company organization at large, retired and therefore ceased to be a director.
". . . .
 "At a called meeting between the Board of Management and the Board of Operatives on November 15, 1985, Mr. Farlow advised the Board of Operatives that at the regular meeting of the Board of Directors scheduled for December 4, 1985, he planned to offer his resignation as President of the Company, to recommend Mr. Green be elected President of the Company and that he hoped that the Board would elect him as Chairman of the Board to continue until his retirement at age 65 in May 1986. At the December 4, 1985 regular meeting of the Board of Directors, plaintiffs Johnson and Sloan were present and defendants Farlow, Green, Doughty, Bragdon, Langner, Harbert, Bragan, Snow and Eagan were present, with defendant Post being absent."
Thus, eleven directors were in attendance at the December 4 meeting. The action taken by the board at that meeting included the following:
Harbert, after routine business, moved that Farlow be elected to serve exclusively as chairman of the board of directors. All of the directors other than Farlow, Johnson, and Sloan voted in favor of the resolution. Johnson and Sloan, the two directors from the Operatives, voted against it, and Farlow abstained. There were thus eight votes in favor.
Farlow then submitted a written resignation as president of ACIPCo, which stated: "I hereby resign as President of American Cast Iron Pipe Company effective immediately." It was unanimously accepted.
Harbert then moved that P.W. Green be elected president and chief executive officer of the company. The motion was seconded and all present voted in favor of the resolution except Sloan and Johnson, who voted against, and Green, who abstained. There were thus eight votes in favor. Green then submitted his resignation, which read: "I hereby resign as Vice President and Sales Manager and Secretary of American Cast Iron Pipe Company effective immediately." The resignation was *Page 542 
unanimously accepted by the Board of Directors.
Harbert then moved to elect Richard Bragdon as secretary of ACIPCo, the motion was seconded, and all present voted in favor, except Johnson and Sloan, who voted against, and Bragdon, who abstained. There were thus eight votes in favor.
Another motion was made, seconded, and adopted by a vote of all present, except Sloan and Johnson, who voted against it, that Green as president of ACIPCo be appointed attorney in fact and agent of ACIPCo to vote all of the shares of capital stock owned by ACIPCo in its wholly-owned subsidiaries, American Valve Hydrant Manufacturing Company, Specification Rubber Products, Inc., and Kristin Shipping Company.
On December 9, 1985, five days after the above board of directors meeting, the Operatives filed their complaint seeking a temporary restraining order, preliminary and final injunctive relief, and a declaratory judgment. The Operatives' requests for numerous and specific forms of relief were based on their underlying contentions that the December 4 directors' meeting, and the actions taken therein, were invalid in that the board was improperly constituted, that the number of directors had fallen below the minimum stated in the by-laws, that directors Farlow, Green, and Bragdon were disqualified by reason of interest, that a quorum was not present, and that the action taken was not done by a vote of the majority of the board as required by the by-laws. By their complaint, the Operatives requested the following specific relief:
 "(a) Declare the purported election of Farlow to serve exclusively as Chairman of the Board of Directors to be invalid. Declare the resignation of Farlow as president effective and declare that Farlow is not an employee of ACIPCO, a beneficiary of the Eagan Trust, a member of the ACIPCO Board of Directors, Board of Management or Board of Trustees;
 "(b) Temporarily restrain and subsequently enjoin the defendant Farlow from acting or purporting to act in any capacity as a director of Chairman of the Board of Directors of ACIPCO, as a member of the Board of Management or Board of Trustees of ACIPCO, as an employee of ACIPCO or as a beneficiary of the Eagan Trust and from receiving any pay, salary or compensation in any form from ACIPCO;
 "(c) Declare the purported election of Green as president of ACIPCO invalid. Declare the resignation of Green as vice president and sales manager effective and declare that Green is not a director, an employee, a member of the Board of Management of ACIPCO or a member of the Board of Trustees of the Eagan Trust, a beneficiary of the Eagan Trust;
 "(d) Temporarily restrain and subsequently enjoin the defendant Green from taking any action or purporting to take any action as president, vice president and sales manager, director, member of the Board of Management, member of the Board of Trustees or employee of ACIPCO and prohibiting the said Green from receiving any salary, payment, or compensation of any kind from ACIPCO;
 "(e) Immediately restrain and subsequently enjoin the defendant Bragdon from any action taken or purported to be taken as secretary of ACIPCO or any of its boards or any board or governing body of the Eagan Trust;
 "(f) Immediately restrain and subsequently enjoin the treasurer of ACIPCO, Mr. Doughty, from making any monetary payments as salary or compensation of any kind to Mr. Farlow or Mr. Green;
 "(g) Declaring that W.E. Snow was improperly elected as a director of ACIPCO in that he was elected as the 'technical director' in violation of the ACIPCO By-Laws, Article VII, Section 14;
 "(h) Immediately restraining and subsequently enjoining the defendant Snow from acting in any manner whatsoever as a director of ACIPCO.
 "(i) Declare that Van L. Richey has not been validly appointed as sales manager of ACIPCO and that his name has been improperly certified to the Board of *Page 543 
Trustees, all as required by the ACIPCO By-Laws;
 "(j) Immediately restrain and subsequently enjoin the meeting of the Board of Trustees now set for December 10, 1985, under the invalid call thereof as set out in Exhibit 'D';
 "(k) Declare invalid the resolution which purported to appoint Mr. Green as the lawful attorney and agent of ACIPCO in voting the stock of all three subsidiaries of ACIPCO;
 "(l) Declare that the Board of Directors of ACIPCO is improperly constituted following the retirement of C.C. Fargason, the resignation of Farlow as president of ACIPCO and the resignation of Green, or any of the foregoing, in that after each such event it then consisted of less than twelve directors, the minimum required by the ACIPCO By-laws to constitute a Board of Directors empowered to act, and immediately restrain and thereafter enjoin the Board of Directors of ACIPCO from acting in any manner on any matter except to adjourn unless and until its membership is increased to twelve or more by the election of additional directors by the stockholders of ACIPCO;
 "(m) Immediately restrain and subsequently enjoin the ACIPCO Board of Directors from acting in any manner on any matter except voting to adjourn unless and until the number of validly elected directors is increased by a vote of the stockholders to a minimum of twelve;
 "(n) Declare that the Board of Management of ACIPCO is not authorized to act as the executive committee of the Board of Directors unless and until the minimum number of validly elected directors equals at least twelve and until the membership of the Board of Management is increased to a minimum of five in accordance with the ACIPCO By-laws.
 "(o) Immediately restrain the ACIPCO Board of Management and the individual members thereof from acting in any manner, as the executive committee of the Board of Directors of ACIPCO and as a Trustee of the Eagan Trust until further order of this Court;
 "(p) Setting this cause for hearing on the issuance of a preliminary injunction and, upon hearing of the same, issuing a preliminary injunction;
 "(q) Issuing a permanent injunction in accordance with the foregoing upon a hearing upon the merits; . . ."
By an order entered on December 10, 1985, the trial court denied the Operatives' request for a temporary restraining order, and on January 14, 1986, the trial court entered another order denying their request for a preliminary injunction. In support of its decision to deny the preliminary injunction, the trial court made the following preliminary findings:
 "The evidence shows that it has been the practice over a great many years to elect a person to [a] director position to serve as Technical Director, even though the position of director designated by a lower number than that for the Technical Director [sixteenth] was not filled. The Court finds and concludes that the use of the numbering system in the ACIPCO By-laws is merely for designation purposes, such as using place numbers in electing various political offices, and therefore it is not necessary to elect someone to all of the director positions that precede the designation of a numbered director.
". . . .
 ". . . The plaintiffs contend that [the December 4, 1985 directors'] meeting and the actions taken therein, were invalid in that the Board was improperly constituted, the number of directors had fallen below the minimum stated in the by-laws, at the least directors Farlow, Green and Bragdon were disqualified by reason of interest, that a quorum was not present, and the action taken was not done by a vote of the majority of the Board as required by the by-laws.
 "A Board of Directors may continue to transact the business of the corporation even though the number of directors is reduced below the minimum required by the by-laws provided that the number of *Page 544 
directors does not fall below a quorum. Nevertheless, in this situation there were thirteen authorized directors of ACIPCO, and since Dr. Fargason's retirement, there have been twelve acting directors, which is the minimum number stated in the by-laws. Thus, with eleven directors present at the meeting, a quorum was present. Although there are situations where a director may be disqualified from voting by reason of personal pecuniary interests, this was not the case here. Defendants Farlow, Green, and Bragdon were not disqualified and could have voted for themselves. Even if Mr. Farlow had been disqualified from voting for himself, and Mr. Green had been disqualified from voting for himself, and Mr. Bragdon had been disqualified from voting for himself, each of them still received more votes than a majority of the then authorized directors.
 "The Court finds and concludes that on December 4, 1985, the Board of Directors of ACIPCO was properly constituted, could transact business on behalf of the Company, a quorum was present at the meeting on said date, and the actions taken at said meeting were validly approved by a majority of the Board of Directors.
 "The party seeking a preliminary injunction must show a fair question as to the existence of a right to be protected; that temporary interference to preserve the status quo is convenient and expedient; and that the injury must be both imminent and irreparable in a court of law. In applying these standards, the Court weighs the relative hardships that either party may suffer against any benefits which might flow from the grant of the preliminary injunction. John Lloyd Co., Inc. v. Stringer, 456 So.2d 1076 (Ala. 1984); Howell Pipeline Company v. Terra Resources, 454 So.2d 1353 (Ala. 1984); Watts v. Victory, 333 So.2d 560 ([Ala.] 1976). The Court finds and concludes that the plaintiffs have failed to show a fair question as to the existence of a right to relief. The Court further finds and concludes that the plaintiffs have failed to show that they will suffer immediate and irreparable injury or damage unless preliminary injunctive relief is granted. Should injunctive relief be granted as sought in this motion, ACIPCO and the other defendants would suffer greater injury and hardship or the likelihood of injury and hardship than would be sustained by plaintiffs.
 "Based upon these matters, the Court finds and concludes that the motion of the plaintiffs for a preliminary [in]junction is due to be denied."
It is from the above order that the Operatives appeal.
As stated, supra, in appeal 85-300, a party appealing from the denial of a motion for preliminary injunctive relief has the burden of showing that in denying that motion, the trial court grossly abused its discretion. This the Operatives have not done. What they have done is argue legal issues that bear strictly on the merits of the Operatives' claims. The Operatives open the argument portion of their brief in this appeal by stating the question for review thusly:
 "The question before the Court in Case No. 85-448 is whether or not the December 4, 1985 meeting of the ACIPCO Board of Directors was conducted in accordance with the requirements of the ACIPCO By-laws and the applicable laws so that the acts and things done at that meeting, specifically, the election of Mr. Carl P. Farlow to serve exclusively as chairman of the Board of Directors, P.W. Green to serve as president and chief executive officer of ACIPCO and Richard Bragdon to serve as secretary of ACIPCO were valid actions. . . ."
The above statement, we respectfully note, is not a correct assessment of the question presented to this Court by this appeal. At the conclusion of their argument in this case, the Operatives ask this Court to:
 "reverse this trial court and direct the trial court on remand to declare that the Board of Directors of ACIPCO is improperly constituted, declare the elections of Messrs. Farlow, Green and Bragdon invalid, declare Messrs. Farlow and Green have resigned from the Board of *Page 545 
Management and consequently the Board of Directors of ACIPCO, appoint some entity to function in control of ACIPCO on an interim basis and immediately provide for the selection of additional directors in accordance with the principles of the Eagan Trust."
From our review of the record in this case, however, it appears that the Operatives have not yet been denied, on the merits, their requests for declaratory and permanent affirmative injunctive relief. While the trial court made certain preliminary findings, it did so only upon consideration of the Operatives' motion for preliminary injunctive relief; by express language in the trial court's order, only that portion of the Operatives' requested relief was denied. Thus, the merits of the legal issues argued by the Operatives are not yet ripe for review.
We recognize that by their arguments, the Operatives are attempting to establish as erroneous the trial court's finding that they "have failed to show a fair question as to the existence of a right to relief." However, this factor is but one of three that the trial court must consider in deciding whether to grant or deny a request for preliminary injunctive relief. Having reviewed the record in this case and having considered the arguments made by each side, we conclude that the Operatives have failed to establish that the trial court's denial of their request for a preliminary injunction amounted to a gross abuse of discretion.
The trial court's preliminary findings comport with a reasonable reading of the ACIPCo by-laws as they pertain to the composition and election of the board of directors and the circumstances under which that board is empowered to act. Furthermore, the evidence in this case supports the trial court's finding that denying the Operatives' motion for a preliminary injunction would not result in imminent and irreparable injury to the Operatives. The Operatives fail topoint to any evidence of record that can establish the imminentand irreparable harm they will suffer as a consequence of thedenial of their preliminary injunction motion, other than their allegation that Management will continue to have unbridled control over ACIPCo, the entire res of the Eagan trust. Moreover, the record clearly supports the trial court's finding that, in weighing the relative degree of injury or benefit to the respective parties, "ACIPCO and the other defendants would suffer greater injury and hardship than would be sustained by plaintiffs [Operatives]." See Double C. Productions, Inc. v.Exposition Enterprises, 404 So.2d 52 (Ala. 1981).
To preliminarily grant the relief requested by the Operatives would require a complete dismantling of the ACIPCo board of directors, divesting its members of all power, thereby drawing into question the validity of the actions already taken by that Board. It would further leave the company without a president, a secretary, or a sales manager. The effect of granting the Operatives' relief preliminarily could have far-reaching consequences in terms of the vital, day-to-day operations of the company. Clearly then, maintenance of the status quo, pending a final determination of the Operatives' claims, on the merits, is the least injurious to ACIPCo itself and those who benefit from its uninterrupted operation, and, supposedly, the protection and preservation of ACIPCo is the aim of each of the respective parties. The status quo in this case is preserved bynot granting the Operatives' motion for preliminary afirmative injunctive relief.
It bears repeating that the issue before us here is the correctness of the order denying the preliminary injunction; "we are not reviewing a final judgment on a hearing of the case on its merits." Howell Pipeline Co v. Terra Resources, supra, 454 So.2d at 1358. We hold that the trial court did not abuse its discretion in refusing to grant the Operatives' request for a preliminary injunction. Therefore, the judgment below is due to be affirmed.
 III. 85-888 Adams v. ACIPCo
At the outset, we note that Management has filed motions to strike the Operatives' brief and reply brief and to dismiss the appeal in this case. The grounds alleged *Page 546 
concern the inclusion by the Operatives of quotes from and references to the affidavit of James Whitehead, which was not included in the record of this appeal. After filing their brief with this Court, the Operatives filed a motion in the trial court to correct and supplement the record in this case to include the Whitehead affidavit. Following a hearing, the trial court denied the Operatives' motion. For that reason, Management's motion to strike is due to be granted, but only as to that portion of the Operatives' briefs in which references to or quotes from the Whitehead affidavit are made.
On January 27, 1986, the Operatives and Management, as trustees, met for the annual meeting of the ACIPCo board of trustees. At this meeting, the respective boards cast their collective vote for or against a slate of individuals nominated for positions on the ACIPCo board of directors. Management nominated and voted in favor of each of the following persons: P.W. Green, president; V.L. Richey, sales manager; R.M. Bragdon, vice president in charge of engineering; E.E. Langner, vice president and works manager; J.P. Doughty, treasurer; Nick Johnson, a member of the Operatives; James Sloan, a member of the Operatives; J.A. Bragan, a member of the clerical forces of the company; Dr. J.W. Reid, an employee from the company at large; C.P. Farlow, chairman of the board of directors; and W.E. Snow, technical director. Each of these persons was an officer or employee of the company. Except for Nick Johnson, James Sloan, and J.A. Bragan, the Operatives voted against each of these persons.
Management nominated and voted in favor of John M. Harbert III, chairman of the board of the Harbert Corporation, to be the director to represent the buying public, and W.R. Eagan, the son of John J. Eagan, to be the director to represent the religious, social, and educational life of the country. Operatives voted against Harbert and Eagan.
Management also nominated Dr. Thomas A. Bartlett, chancellor of the University of Alabama System, and Wallace D. Malone, Jr., chairman and chief executive officer of Southtrust Corporation, to be outside directors of the company. Operatives voted against both of these men. Because the Operatives and Management failed to agree on all of the individuals nominated to the board of directors, pursuant to the following provision in the rules and regulations of the board of trustees found in Section 12 of Article VII of the ACIPCo by-laws, Management directed R.M. Bragdon, as secretary of the board of trustees, to refer the questions in dispute regarding the election of directors to the board of directors for final decision:
 ". . . In the event the two units of the Board of Trustees shall fail to agree upon any question, then said question in dispute may be referred to the Board of Directors, whose decision on said question in dispute shall be final. Either the Board of Management or the Board of Operatives may direct the Secretary of the Board of Trustees to refer said question to the Board of Directors. The Secretary shall make such reference in writing. Any meeting of the members of the Board of Directors held for the purpose of deciding a question in dispute between the two units shall be presided over by an attorney authorized to practice law in Birmingham, Alabama, who is not a member of either the Board of Operatives or the Board of Management. Such presiding officer shall be paid a reasonable fee for his services. He shall be appointed by the presiding judge of the court having jurisdiction over this trust, which court is at the present time the Circuit Court of the Tenth Judicial Circuit of Alabama."
By letter dated January 30, 1986, directed to all of the ACIPCo directors, Bragdon referred the election questions to the directors for final decision.
Although the Operatives contend that, besides those referred by Management to the board of directors, disputes over additional questions arose at the January 27, 1980, board of trustees meeting (and thus the list of those referred by Management to the directors for final decision was incomplete), there is nothing in the record *Page 547 
indicating that the Operatives sought to refer those questions themselves, even though the above-quoted provision gives "[e]ither the Board of Management or the Board of Operatives" the right to direct the secretary to refer a disputed question to the directors.
In further pursuance of the above-quoted provision of the ACIPCo by-laws, Management filed its petition with "the presiding judge of the court having jurisdiction over this trust," seeking the appointment of "an attorney authorized to practice law in Birmingham, Alabama, who is not a member of either the Board of Operatives or the Board of Management," to preside over "[a]ny meeting of the members of the Board of Directors held for the purpose of deciding" the election questions in dispute referred to the directors by Management. Following the mandate of this Court's decision in Ex parte NickJohnson, 481 So.2d 353, 358 (Ala. 1985), Management made the Operatives parties to the proceeding, giving them "notice and an opportunity to appear and participate in the appointment of an attorney provided for in such Rules and Regulations."
At the first scheduled hearing on the petition for appointment on March 10, 1986, the Operatives appeared and filed three motions: a motion to stay, a motion to dismiss, and a motion for summary judgment. The motions to stay and dismiss were denied, and the hearing on the petition for appointment was continued. Following a hearing on April 18, 1986, Judge John N. Bryan, Jr., the presiding judge of the Tenth Judicial Circuit, entered an order dated April 22, 1986, appointing the Honorable J.N. Holt to preside over the ACIPCo board of directors meeting to decide the questions in dispute which had been referred to them. As an aid in understanding the posture of this appeal, Judge Bryan's order is set out in its entirety below:
"ORDER OF APPOINTMENT
 "This matter is once again before the undersigned, as the presiding judge of the Tenth Judicial Circuit of Alabama, for the appointment of an attorney to preside over a meeting of the Board of Directors of American Cast Iron Pipe Company.
 "The respondents have raised a number of issues. These issues will not be set out as the respondents have been granted time to advance such issues by the various pleadings, depositions, and by arguments of counsel with a court reporter present. There is, therefore, an adequate record, and only brief comment will be made as to certain issues to clarify the ruling hereinafter made.
 "Able counsel for the respondents argued that the Supreme Court ruled in Ex parte: Nick Johnson, et al, 418 So.2d 353 (1985), that the undersigned, as presiding judge of this circuit, is vested with complete jurisdiction as to all issues between the parties. The respondents take the position that once this pending petition was filed in the clerk's office and given a case action number it took the status of any other civil court action.
 "I do not agree with this contention by the respondents and do not believe that to be the ruling or intent of the Supreme Court in its ruling in Ex parte Nick Johnson, et al. The filing of such petition and assignment of a case action number serves only to index this matter and make a permanent record, as well as a record for examination by state auditors. The undersigned, in his capacity and office of presiding judge of this circuit, is designated to be the person to make appointment of an attorney in the event of a dispute requiring action by the Board of Directors. The undersigned perceives his duty and obligations under the court order of April 6, 1942, in the case of W.D. Moore, et al. vs. Kyle Hardin, et al., Case No. 53715, in the Circuit Court of the Tenth Judicial Circuit of Alabama, Equity Division, to be:
 "Upon receipt of a petition to appoint attorney to preside over a meeting of the Board of Directors of American Cast Iron Pipe Company, with due notice being given to the respondents of such petition, to set same for hearing. At such hearing, said respondents to be granted the right to participate and the *Page 548 
right to be heard on who would be appointed as the attorney to preside over the meeting of the said Board of Directors. I view this to be the sole duty and obligation placed on the undersigned in his capacity and office of presiding judge of this circuit. I still view my function to be principally a ministerial duty coupled with a judicial duty to see that notice of the petition and hearing on said petition be given to each of the party respondents.
 "All party respondents have been duly served and hearings conducted. The respondents have been allowed to file various motions, take depositions, and present arguments to the court with a court reporter present. This was done to allow the respondents to make such record as they desired. All motions so filed by the respondents are deemed overruled as not being proper to be considered by the undersigned for ruling.
 "The respondents have at no time argued or presented evidence that no dispute in fact existed between the Board of Management or the Board of Operatives or that said question was not properly referred to the Board of Directors. The attorney for the respondents stated in his arguments before a court reporter that the respondents had no objection to the appointment of Mr. J.N. Holt, if such appointment was to be made. Respondents' counsel was very candid in his statement that their objection was directed to any appointment being made, but that they specifically had no objection to Mr. J.N. Holt.
 "I can reach no other conclusion but that once a petition for appointment of counsel is received, with proper party respondents, due notice given, and hearing conducted, but to comply with the mandate of the 1942 court ruling directing the appointment of an attorney to preside over the meeting of the Board of Directors.
 "The 1942 ruling, in my opinion, did not place jurisdiction of all issues between the parties before the presiding judge of this circuit. There is now at this time pending a Rule 60(b) motion in the original Moore vs. Hardin case. This Rule 60(b) motion was filed by the respondents and is presently before Judge Marvin Cherner in the Equity Division of this circuit. In fact, the respondents sought injunctive relief from that court asking that the undersigned be enjoined from acting on this pending petition. Said injunctive relief was denied. Without question, Judge Cherner has jurisdiction as to the issues raised by the respondents before the undersigned and Judge Cherner can certainly stay any act of the Board of Directors pending ruling on the said 60(b) motion.
 "I find my duty to be clear under the 1942 decree. Until such time as that decree is modified or the Supreme Court orders otherwise, I find . . . my jurisdiction, if such is the proper connotation, to be limited to the act of appointment of an attorney to preside over the meeting of the Board of Directors when proper petition is presented for such action.
 "The petition having been considered . . . is this date granted. The Honorable J.N. Holt is this date appointed to preside over the meeting of the Board of Directors of American Cast Iron Pipe Company. Said appointment shall remain in effect for so long as the questions in dispute set forth in said petition are before the board. It is further directed that a copy of this appointment be presented to the Honorable J.N. Holt and the attorneys of record for the parties.
 "DONE and ORDERED this 22nd day of April, 1986." (Emphasis added.)
The Operatives raise a number of issues by their appeal. Nevertheless, we must first consider the parameters of Judge Bryan's "authority" in this case to consider many of these issues interjected by the Operatives as affirmative defenses to Management's petition for appointment. We agree with Judge Bryan that his duty to appoint a presiding attorney is ministerial, provided that it is undisputed and uncontroverted
that all of the prerequisites to such an appointment have been met. That is, all of the conditions set out in Article VII, Section 12, of the ACIPCo *Page 549 
by-laws for such an appointment are present,[5] as well as the prerequisite mandated by this Court in Ex parte Johnson, supra, requiring that notice and opportunity to be heard be given to all necessary parties. If there are not factual disputes as to whether these prerequisites are met, the presiding judge's duty is purely ministerial and he has no discretion in making the appointment. Under these circumstances, he may, by way of mandamus, be compelled to perform his duty, or, conversely, be prevented from performing that duty where it is undisputed that one or more of the above prerequisites have not been met. SeeEx parte Johnson, supra, and the dissenting opinion at 481 So.2d 360-61.
It is only when there are factual issues as to whether all of the prerequisites to such an appointment have been met that the presiding judge's function becomes at least quasi-judicial. In that instance, the proceedings become adversarial, and by "deciding" the factual issues, and thereupon determining whether the appointment should be made, the presiding judge assumes the role of factfinder. Under these circumstances, the presiding judge's "decision" to appoint an attorney or not is one that would support an appeal. However, where there are no such factual issues to be decided, mandamus is the appropriate method of review.
In either event, upon the filing of only a petition for the appointment of an attorney under the language of the by-laws,supra, the purview of the presiding judge's power or "jurisdiction" is not in any way broadened to permit him to consider other matters besides those discussed above pertaining to the prerequisites for such an appointment. In other words, in the absence of a separate complaint filed invoking the full jurisdiction of the circuit court, it would be inappropriate for either party to present to the presiding judge matters pertaining to, for example, the merits of the reasons underlying the disputes between the Operatives and Management which necessitated resolution by the board of directors and therefore the petition for the appointment of a presiding attorney. Nor would it be appropriate, under a bare petition for appointment, for either party to present arguments to the presiding judge which, if accepted, would serve to invalidate the provision of the by-laws giving him the power to appoint an attorney to preside. Thus, Judge Bryan properly declined to rule on the issues pertaining to matters described above raised by the Operatives in response to Management's petition for appointment. (See discussion ante.)
In this case, the Operatives responded to the petition filed by Management with an answer in which they claimed, among other things, that Management (petitioners) "failed to comply with the By-laws of [ACIPCo] as required by the rules and regulations of the Board of Trustees and the decision inMoore v. Hardin." They further claimed that "[t]he questions to be considered by the Board of Directors have been improperly certified by the secretary of the Board of Trustees to the Board of Directors." The record in this case clearly establishes otherwise, and, therefore, the presiding judge's decision to appoint an attorney is due to be affirmed.
By their answer, the Operatives also sought to prevent the appointment by interjecting a number of other matters. They claimed that Management is estopped from petitioning for an appointment because "they have already filed two prior actions which are still pending in this Court requesting appointment of a Birmingham attorney *Page 550 
to preside over a meeting of the American Cast Iron Pipe Company Board of Directors and have obtained the relief requested, but have failed and refused to exercise such relief and have abandoned those actions without pursuing or concluding the same or using the relief granted."
It is undisputed that the two prior petitions referred to above were filed as a result of prior disputes between the Operatives and Management. It may very well be that some of the prior disputes overlap with those that arose during the January 27, 1986, meeting of the board of trustees of ACIPCo. Nevertheless, we fail to perceive how filing this petition, in addition to the previous petitions, "has probably injuriously affected substantial rights" of the Operatives. Rule 45, A.R.App.P. Indeed, had Management sought merely to make use of an appointment it had already obtained through prior petitions, it is likely that the Operatives would now be complaining that, because a subsequent meeting of the trustees was held out of which new disputes arose, another petition for appointment is necessary. On these facts, we find the Operatives' estoppel argument to be without merit.
The Operatives also sought to prevent the appointment essentially by attacking the validity of Article VII, Section 12, of the ACIPCO by-laws insofar as it allows the board of directors to resolve disputes between the Operatives and Management. Specifically, the Operatives alleged:
 "The Board of Directors is not an independent body as envisioned by the Court in Moore v. Hardin
and in the rules and regulations of the Board of Trustees, but is merely a captive of the Board of Management of the American Cast Iron Pipe Company and, under those circumstances, any reference of any questions in dispute between the Board of Operatives and the Board of Management and the Board of Trustees to the Board of Directors is a sham and an artifice by the Board of Management as there is complete domination of the Board of Directors by the Board of Management.
". . . .
 "The reference of the questions on which divided votes were taken in the Board of Trustees at the subject meeting to the Board of Directors is contrary and inimical to the interest of the trust, the beneficiaries of the trust and is contrary to the duties of the trustees. . . ."
The merits of the issues raised by these allegations, however, are the subject of two other separate proceedings: one has been filed in Georgia seeking to challenge the change that was made in the Eagan codicil in 1924 at the request of Eagan's executors when the will was probated in Georgia in Eagan v.Moore, Case No. 61106 (Super.Ct., Fulton Co., Ga., December 15, 1924). (The codicil originally provided that tie votes between the Operatives and Management were to be resolved by a majority vote of the trustees presumably voting individually rather than each board casting one collective vote.) The other is a proceeding under Rule 60(b)(6), A.R.Civ.P., seeking to set aside the 1942 circuit court decree in Moore v. Hardin, Case No. 53715 (10th Jud. Cir. of Ala., Equity, 1942), approving the rules and regulations submitted by the 1942 ACIPCo board of trustees (which incorporated the above change), and thereby finding that the trustees had the power under the Eagan codicil to make such rules and regulations to govern themselves as well as subsequent trustees. (The Operatives' appeal from the denial of this Rule 60(b) motion is consolidated herewith and is discussed ante.) Thus, not only was it improper for the Operatives to raise these matters in this proceeding (brought simply to have an attorney appointed) because they were the subject of other separate actions (see Code of 1975, §6-5-440), but also the trial court was correct to follow the ACIPCo rules and regulations empowering it to appoint an attorney under the facts of this case. Until the Operatives succeed in their attempts to set aside decisions upholding these rules, the trial court is duty bound to follow those decisions.
Based on the foregoing, the order below is due to be affirmed. *Page 551 
 IV. 85-1032 Adams v. Green
On February 21, 1986, the Operatives filed a motion entitled "Motion Under Rule 60, Alabama Rules of Civil Procedure For Relief From Judgment And To Declare Judgment Void And For Preliminary Injunction." By that motion, the Operatives sought to set aside and/or obtain relief from a decree entered on April 6, 1942, in the case of Moore v. Hardin, Case No. 53715 (10th Jud. Cir. of Ala., Equity, 1942).
The bill of complaint filed in Moore v. Hardin by the ACIPCo board of trustees in 1942 named as respondents 12 ACIPCo employees, both white and black, employed in each of the various departments of ACIPCo, and alleged that all 1,500 ACIPCo employees could not be made respondents "without great inconvenience, . . . expense, and . . . oppressive delays," and further alleged that the "interest of all and each of said [ACIPCo] employees . . . in the subject matter of this suit is the same, and the failure to make other employees parties to this cause will not adversely affect any of the rights of any of said employees as such employees if a proper representation of employees be made parties hereto." After generally averring the origin, history, and composition of the ACIPCo board of trustees, the trustees alleged that their number "is comparatively large," and that the individual members changed from time to time, "especially . . . the members of the Board of Operatives, who are elected by the employees of the Company." The trustees, therefore, believed that they needed a set of rules and regulations for guidance in performing their duties as trustees. In accord with that belief, the 1942 trustees, predecessors to the parties herein, adopted a set of rules and regulations at the February 1942 board of trustees meeting, of which, by their complaint, they sought court approval. Specifically, the trustees sought instructions from the court as to their administration of the trust and a declaration of their rights, particularly as to
 "1. Whether or not your complainants as such trustees in the proper management and conduct of said trust have the right and authority to adopt reasonable rules and regulations which will govern the conduct of said trust and the actions of your complainants and their successors as trustees in the management and conduct of such trust.
 "2. Whether or not in the opinion of this court the rules and regulations submitted herewith, marked Exhibit G, are reasonable and proper rules and regulations to be adopted by the trustees, and, if so, that this court will duly approve same."
The trustees also asked the court to decree that the 12 employees named respondents represented the interests of all ACIPCo employees.
Each of the respondents individually executed a joint acceptance of service on April 2, 1942, stating as follows:
 "We hereby accept service of summons in the above-styled cause and do hereby waive any and all further notice of the filing of the bill of complaint in this cause and do agree that said case may be heard immediately."
An answer was also filed by Smyer Smyer, as solicitors for respondents; that answer admitted certain of the allegations of the complaint and neither admitted nor denied certain others. The respondents also joined with the complainants in asking for instructions and directions as to the proper administration of the trust, and put in issue the question of whether or not the trustees have the right and authority to adopt reasonable rules and regulations governing the conduct of the trust, and the action of the trustees and their successors in the management and conduct of the trust.
Under the rules of procedure and practice in force at that time, the cause was submitted on the bill of complaint and exhibits, the answer, and the testimony of witnesses whose testimony had been taken down by a commissioner and submitted in writing. Based on this submission, the trial court entered a lengthy order in which it found, inter alia, that the 12 employees named as respondents were sufficiently representative of all classes of ACIPCo employees, and that it was, therefore, unnecessary *Page 552 
to make any other employees respondents to the cause. The court further found that it was desirable, and, in fact, necessary to the proper operation of the Eagan plan for the trustees to have suitable rules and regulations for the government of the board of trustees and that the trustees had the "right and authority" to adopt such rules and regulations. The court then specifically decreed that:
 "The rules and regulations adopted by complainants as such trustees are reasonable and proper rules and regulations to be adopted by them as such trustees and said rules and regulations are hereby in all things approved, and the complainants and their successors as such trustees are ordered to be governed and directed by said rules and regulations in their conduct of said trust."
No appeal was taken from this order, and the trustees have been governed by the rules and regulations approved therein since April 6, 1942. By their Rule 60(b) motion, the Operatives sought to have this 1942 order set aside and declared void, alleging as grounds the following:
"(a) the court lacked jurisdiction;
 "(b) the order promulgates a racially discriminatory scheme of trust management and control;
 "(c) no guardian ad litem had been appointed to represent the interests of future beneficiaries and minor beneficiaries of the trust;
 "(d) it purports to adjudicate the rights of parties not before the court;
 "(e) the decree was entered in violation of the then applicable rules of law; and
 "(f) the proceedings were devoid of fundamental compliance with the requirements of procedural and substantive due process."
By order dated March 7, 1986, the trial court denied the Operatives' request for a preliminary injunction. Then, on May 29, 1986, the trial court entered an order designated an "Order Denying Preliminary Injunction on the Merits." The substance of this order, however, deals exclusively with the merits of the Operatives' request for Rule 60(b) relief; within the body of the order, there is no discussion whatsoever of the criteria applicable to motions for preliminary injunctions nor of whether the Operatives are entitled to preliminary injunctive relief. In its order, the trial court discussed only the merits of the grounds alleged by the Operatives in support of their Rule 60(b) motion, and thereby denied that motion. The parties have so construed this order in their respective briefs and arguments to this court. Therefore, despite its denomination and the language of the mandate at the end, we treat this order according to its substance rather than its form and consider it as an adjudication (i.e., a denial) of the Operatives' Rule 60(b) motion.
Management correctly states the standard of review applicable to a trial court's decision to grant or deny a Rule 60(b) motion for relief from judgment:
 "A strong presumption of correctness attaches to the trial court's determination of a motion made pursuant to Rule 60(b), and the decision whether to grant or deny the motion is within the sound discretion of the trial judge, and the appellate standard of review is whether the trial court abused its discretion. Pierson v. Pierson, 347 So.2d 985 (Ala. 1977). In reviewing a ruling of a trial court on a Rule 60(b)(6) motion, the trial court's decision will not be disturbed unless it is determined 'that there is an absence of reasonable cause, that rights of others subsequently arising would be adversely affected, or that it is unjust.' [Citations omitted.]"
Ex parte Dowling, 477 So.2d 400, 402-03 (Ala. 1984). Having reviewed the record in this case, along with the respective arguments of the parties and the applicable authorities, we cannot say the trial court abused its discretion in denying the Operatives' motion to set aside a judgment entered almost 44 years ago. Indeed, under Alabama law, the only ground that can be asserted to set aside a 44-year-old judgment is that the judgment is void on its face. See Sweeney v. Tritsch, 151 Ala. 242,44 So. 184 (1907). However, a "judgment cannot be void when the Court has *Page 553 
jurisdiction of the parties and the subject matter." Raine v.First Western Bank, 362 So.2d 846, 849 (Ala. 1978). The Operatives contend that the court in Moore v. Hardin, supra, had neither subject matter jurisdiction nor jurisdiction of all the necessary parties. Specifically, they contend the judgment is void because: (1) no guardian ad litem was appointed to represent minor beneficiaries and absent beneficiaries and trustees; (2) the necessary parties were not before the court; and (3) there was no case or controversy. As to these three reasons, the trial court held as follows:
 "Counsel for the plaintiffs is in error in stating that a justiciable controversy must be alleged and shown before this Court can take jurisdiction over a request by a trustee for instructions in the administration of a trust. See, e.g., Peach v. First Nat'l Bank of Birmingham, 247 Ala. 463, 25 So.2d 153 (1946); Thurlow v. Berry, 247 Ala. 631, 25 So.2d 726 (1946); Kimbrough v. Dickinson, 247 Ala. 324, 24 So.2d 424 (1946); Dallas Art League v. Weaver, 240 Ala. 432, 199 So. 831 (1941).
 "In Peach, supra, the Court quoted with approval the following:
 " 'As a general principle when a trustee is in reasonable doubt as to the extent of his powers or as to the proper manner in which to proceed under the trust, he may apply to a court of equity, which will interpret the trust instrument when necessary and when it is ambiguous in order to give him directions without other equity appearing in the bill.'
 "In Bogert, The Law of Trusts Trustees, § 559 (2d Rev. 1980), the following is provided:
 " 'Equity has jurisdiction over all matters relating to trust property, and in the execution and administration of the trust, in all cases of doubt as to their rights and liabilities and what their conduct should be, trustees are entitled to and should seek instruction and direction from the court.'
". . . .
 "In Ex parte Nick Johnson, [481 So.2d 353 (Ala. 1985)], ACIPCO filed a petition in the Tenth Judicial Circuit requesting the Presiding Judge to appoint an attorney to preside over the meeting of the Board of Directors of ACIPCO as provided for in the rules and regulations quoted in this opinion. The Court appointed an attorney to preside over the meeting without notice having been given to any other party. Three days later, members of the Board of Operatives filed a motion to vacate the appointment. When this motion was denied, the Board of Operatives filed a petition for writ of mandamus with the Supreme Court of Alabama seeking to require the circuit court to vacate the appointment. The Supreme Court granted the writ, but only on the ground that the members of the Board of Operatives were entitled to reasonable notice and an opportunity to be heard in opposition to the application. The Supreme Court there stated:
 " 'We do not agree with the petitioners' contention that the court below lacked subject matter jurisdiction. As we view the matter, the court acquired jurisdiction in the 1942 declaratory judgment action and, by approving and adopting the rules and regulations of the Board of Trustees, it retained jurisdiction over the trust, the corpus of which is all located in Jefferson County. . . .'
 "This Court also agrees with ACIPCO that it was not necessary in 1942 that every employee of ACIPCO be made a party or that a guardian ad litem had been appointed by the Court to represent future employees or those who were minors.
"Equity Rule 30 provided in part as follows:
 " 'When parties are numerous, court may proceed, having before it parties to represent adverse interests. When the parties having vested interest in real or personal property are very numerous, and cannot, without manifest inconvenience and oppressive delays in the suit, be all brought before it, the court, in its discretion, may dispense with the making of all of *Page 554 
them parties, and may proceed in the suit, having sufficient parties before it to represent all the adverse interests of the plaintiff and the defendant in the suit. But in such cases the decree shall be without prejudice to the rights of the absent parties in that they may claim their shares of any funds in court, or if paid out by order of court, may recover their shares from parties to whom such funds have been so paid.'
 "Similarly, Title 7, Section 128, Alabama Code 1958, provided:
 " 'In equity of the parties to the action, those who are united in interest must be joined as plaintiffs or defendants; if the consent of any one who should have been joined as a plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the bill of complaint, and when the question is one of a common or general interest of many persons, or where the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all.'
 "That part of the rules and regulations of which the plaintiffs complain merely sets out a procedure for resolving a dispute occurring between the two units of the Board of Trustees. The Court agrees with ACIPCO that all of the employees were not necessary parties to the 1942 action."
We agree with the trial court that requirements of both personal and subject matter jurisdiction were met in this case.
With respect to the Operatives' contention that necessary parties (including a guardian ad litem representing minor and absent beneficiaries and trustees) were not before the court, we point out that this issue of the sufficiency of naming only 12 employees as respondents was specifically adjudicated by the trial court in 1942. The issue was raised in the petition by the petitioners, and the trial court ruled as follows:
 "3. The beneficiaries of the trust created by said codicil to the will of John J. Eagan are the employees of American Cast Iron Pipe Company. These employees at the present time are more than one thousand five hundred in number. All of said employees reside in Jefferson County, Alabama, with the exception of a few employed at branch sales offices. All of the trustees reside in Jefferson County, Alabama. It is impracticable to make all of the employees of American Cast Iron Pipe Company respondents to this cause. To do so would cause great inconvenience, great expense, and oppressive delays in hearing this cause, and would result in no useful purpose. Twelve of said employees have been made respondents and are represented by their solicitor of record. They are employed in the various departments of the plant of the American Cast Iron Pipe Company and perform various classes of work. Some of said respondents are white employees and some are negro employees. The interest of all of the employees of American Cast Iron Pipe Company in the subject matter of this suit is the same, and the court finds that the employees named respondents are sufficiently representative of all classes of such employees, and that it is unnecessary to make any other of such employees respondents to this cause." (Emphasis added.)
It is "well-settled that the denial of a 60(b) motiondoes not bring up for review on appeal the correctness of thejudgment which the movant seeks to set aside, but is limited to deciding the correctness of the order from which he appeals." (Emphasis added.) Raine v. First Western Bank, 362 So.2d at 848. Accordingly, the issue of whether the named respondents sufficiently represented the interests of those whose interests the Operatives now claim were not represented, is not properly reviewable in these proceedings. On their face, the 1942 proceedings disclose that the court acquired personal jurisdiction over those employees named respondents; the document evidencing service of process is valid on its face.
Furthermore, we agree with and adopt the trial court's order determining that the *Page 555 
equity court had subject matter jurisdiction over the petition filed in 1942. Additional authority for that holding includes the following:
Bogert, The Law of Trusts Trustees, § 559 (Rev.2d ed. 1980):
 "As a part of its general jurisdiction over trusts, the court of equity has power to instruct and advise the trustee as to his powers and duties, on his request or at the request of a beneficiary. Hence many doubts arising from ambiguity of the trust instrument or uncertainty of the law regarding the powers of a particular trustee may be resolved." (Emphasis added.)
Gilmer v. Gilmer, 245 Ala. 450, 453-54, 17 So.2d 529, 531
(1944):
 "As a general principle when a trustee is in reasonable doubt as to the extent of his powers or as to the proper manner in which to proceed under the trust, he may apply to a court of equity, which will interpret the trust instrument when necessary and when it is ambiguous in order to give him directions without other equity appearing in the bill. . . ."
Collins v. Morgan County National Bank, 226 Ala. 376, 379,147 So. 161, 163 (1933), quoting 1 Pom.Eq., § 352:
 "[T]he rule is well understood that: 'Whenever there is any bona fide doubt as to the true meaning and intent of provisions of the instrument creating the trust or as to the particular course which he ought to pursue, the trustee is always entitled to maintain a suit in equity at the expense of the trust estate, and obtain a judicial construction of the instrument and directions as to his own conduct.' . . ."
The Operatives also claim that the 1942 decree is due to be set aside on account of fraud. Under Rule 60(b)(3), motions to set aside a judgment because of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party" must be brought "not more than four months after the judgment, order, or proceeding was entered or taken." Rule 60(b), however, goes on to provide that:
 "This rule does not limit the power of a court to entertain an independent action within a reasonable time and not to exceed three years after the entry of the judgment (or such additional time as is given by §§ 6-2-3 and 6-2-8, Code of Ala.) to relieve a party from a judgment, order, or proceeding, or to set aside a judgment for fraud upon the court. . . ."
Clearly, even under § 6-2-3, Code of 1975, the Operatives' claim for "fraud upon the court" is barred because, without question, more than two years prior to their filing of this action, the Operatives knew or should have known of the facts they alleged constituted fraud. This is especially true of the Operatives' claim that in 1942 the petitioners misrepresented to the court that the copy of Mr. Eagan's codicil attached to the bill of complaint was as Mr. Eagan wrote it. In other words, the Operatives contend that it was fraud upon the court not to specifically aver that modifications to the codicil had been made when the will was probated in Georgia in 1924. Eaganv. Moore, supra. We think that by using reasonable diligence, the Operatives could have discovered this alleged fraudulent omission far sooner than 43 years after the filing of the petition by the trustees in 1942.
In further support of their fraud claim, the Operatives offered the affidavit of James Whitehead, who was one of the 12 respondent/employees in Moore v. Hardin, supra. In his affidavit, Whitehead states the following:
 "The document which is attached to this affidavit [the joint acceptance of service] bears my signature. I remember signing the document in 1942 but I was not told at that time what the document was nor was I told that it had anything to do with any court proceedings.
 "The circumstances which led up to my signing the document which is attached to this affidavit are as follows:
 ". . . I learned that there was going to be an opening in the company's 'YMCA Building.' . . . This job which I was interested in, in the YMCA Building was a white collar job. . . . I was very interested *Page 556 
in moving from the No. 2 ramming station in the monocast department to this white collar position in the YMCA Building and so I applied for the YMCA job opening.
 "After I applied for the YMCA job, my supervisor on the No. 2 ramming station in the monocast department, Mr. Eugene Sparkman, approached me and asked if I would sign a document which he said would state that I approved of the Eagan plan. . . . He said that I would have to sign a document which stated that I pledged to uphold the Eagan plan if I wanted to get the YMCA job. He told me to go to Mr. Dyer's office to sign the document he was talking about. . . . When I got to Mr. Dyer's office, Mr. Dyer stated that he had been expecting me and he already had a document on his desk which I was supposed to sign. Mr. Dyer asked me to sign the document. A copy of that document is attached to this affidavit. I did not read this document before I signed it because I was told that it only said that I pledged to uphold the Eagan plan. Neither Mr. Sparkman nor Mr. Dyer ever told me that the document which I was asked to sign and which I did sign had anything to do with any court case.
 "I was never asked if I was willing to represent other blacks or other employees of ACIPCO. I never saw or heard any testimony of any kind from W.D. Moore, Henry J. Noble, C.D. Parr, A.J. Bryant, Sr., or Lawton B. Bascomb. I never saw or met any lawyer named Smyer nor did I ever see or meet or talk with any lawyer at all about any court case or about anything in connection with my signing of the document in question. I was never told that any lawyer named Smyer or any other lawyer was representing me." (Emphasis added.)
First of all, Whitehead's affidavit does not support the Operatives' claim for fraud on the court. See Duncan v.Johnson, 338 So.2d 1243 (Ala. 1976); Bolden v. Sloss SheffieldSteel Iron Co., 215 Ala. 334, 110 So. 574 (1925). Rather, if these facts establish anything, it would be only that a fraud was perpetrated upon one of the respondents, not upon the court, and such a fraud claim falls under Rule 60(b)(3), which must be brought within four months after judgment is entered. Furthermore, even if these facts constituted a fraud upon the court, that claim is clearly barred by § 6-2-3, supra, because the fact of the purported fraud could have been readily discovered by Whitehead had he read the acceptance of service at the time he signed it on April 2, 1942. See Sharpe v. CrookRealty Co., 508 So.2d 262 (Ala. 1987); Gonzales v. U-JChevrolet Co., 451 So.2d 244 (Ala. 1984); Torres v. State FarmFire Casualty Co., 438 So.2d 757 (Ala. 1983); Sexton v.Liberty National Life Ins. Co., 405 So.2d 18 (Ala. 1981);Seybold v. Magnolia Land Co., 376 So.2d 1083 (Ala. 1979). See also Myers v. Geneva Life Ins. Co., 495 So.2d 532 (Ala. 1986).
The Operatives also attempted to have the 1942 judgment set aside because, at that time, the trust was racially discriminatory. We find the reasoning of the trial court on this issue to be correct and herewith adopt that portion of the trial court's order set out below:
 "It is true, as counsel for the Board of Operatives states, that certain provisions of the rules and regulations adopted under the Eagan trust have been found to be in violation of the 1964 Civil Rights Act and in violation of the Constitution. In Pettway v. American Cast Iron Pipe Co., 322 [332] F. Supp. 811 (N.D.Ala. 1970) [reversed and remanded on other grounds, 474 [494] F.2d 211 (5th Cir. 1974)], the federal district court held that the racial restriction on membership on the Board of Operatives to 'white men only' was unlawful and 'must be removed.' However, the federal district court also stated:
 " '. . . The Board of Operatives will continue to operate and to carry out its functions as an integral part of the Eagan plan with its members serving as joint stockholders and co-trustees under the Eagan codicil as in the past, subject, however, to the eliminating of the racial restrictions on its members. The court further finds that upon the *Page 557 
elimination of the racial restriction on membership to the Board of Operatives, the continued and separate existence of the Advisory Auxilliary Board composed of negro employees only and elected by negro employees only would be unnecessary and the court holds that the continuation of such separate Auxilliary Board would also constitute a violation of Title VII. Therefore, the Auxilliary Board must be abolished simultaneously with the elimination of the racial restriction on membership of the Board of Operatives.
 " 'The elimination of the racial restriction on the Board of Operatives, together with disestablishment of the separate Auxilliary Board will, in the opinion of the court, provide all employees of the company an equal opportunity regardless of the race or color to vote for representatives on the Board of Operatives and to serve on the Board of Operatives. Furthermore, in the future, the members of the Board of Operatives, elected and serving without regard to race or color, will be able to appoint all members of the standing committees and special committees of the Board of Operatives without being in violation of the provisions of Title VII.'
 "At a subsequent evidentiary hearing, the federal district court approved a plan submitted by ACIPCo for the purpose of carrying out the directives of the Court. The plan of compliance enlarged the number of electoral districts from five to twelve and provided for the the election of one representative on the Board of Operatives for each district. The Court concluded:
 " 'The Court feels that it should not, and it will not, engage in a presumption that employees elected from fair and properly drawn electoral districts, will not fairly represent the interest and rights of employees of another race or color and faithfully serve as trustees under Mr. Eagan's will. . . .'
 "In short, the federal district court did not conclude that the Eagan plan was invalid or that this Court's decree rendered in 1942 was invalid because of racially restrictive provisions contained in the original plan. Instead, the Court ordered the removal of those restrictions and then approved the plan as being in compliance with the Civil Rights Act.
 "It is not for this Court at this time to conclude that this Court's decree rendered in 1942 interpreting the plan is invalid because racial restrictions since removed were left in place in 1942."
Finally, the Operatives argue in effect that the totality of their arguments justifies granting them relief from the 1942 judgment under Rule 60(b)(6). They contend that the effect of the 1942 decree frustrates Mr. Eagan's basic intent in that it allows Management trustees to assume "absolute and unbridled control over the trust estate." Farlow v. Adams, 474 So.2d at 58.
Although the trial court did not specifically address the Operatives' Rule 60(b)(6) claim, we agree with Management that the Operatives have not demonstrated compelling and extraordinary circumstances entitling them to Rule 60(b)(6) relief. Furthermore, a Rule 60(b)(6) motion must be based on some reason other than those stated in Rule 60(b)(1) through (5), and there is the additional requirement that a Rule 60(b)(6) motion be brought within a "reasonable time" after entry of judgment. As explained by the Seventh Circuit in its discussion of the "reasonable time" requirement of Rule 60(b) in Planet Corp. v. Sullivan, 702 F.2d 123, 126 (7th Cir. 1983), "[w]hat constitutes 'reasonable time' depends on the facts of each case, taking into consideration the interest in finality,the reason for delay, the practical ability to learn earlier ofthe grounds relied upon, and prejudice to other parties." (Quoting Ashford v. Steuart, 657 F.2d 1053, 1055 (9th Cir. 1981)). (Emphasis added.)
It clearly appears that if the rules and regulations approved in the 1942 decree permitted the Management to exercise "absolute and unbridled" control over the trust estate, that result should have been evident to the Operatives much sooner than almost 43 years later. Accordingly, we hold that *Page 558 
the Operatives' Rule 60(b)(6) motion is untimely and, therefore, the trial court did not abuse its discretion in denying the motion.
Based on the foregoing, the judgments below are due to be, and they hereby are, affirmed.
AFFIRMED.
MADDOX, JONES, SHORES and HOUSTON, JJ., concur.
[1] In their respective briefs in each of these cases, the appellants and appellees have denominated each other as "Board of Operatives" and "Board of Management." We follow that denomination herein, referring to each as "Operatives" and "Management."
[2] The Board of Operatives had previously filed a complaint on February 2, 1985, seeking a temporary restraining order and various forms of injunctive and declaratory relief. On February 21, 1985, the trial court entered a consent order indicating that, as to the matters in which the Operatives sought preliminary injunctive relief, the parties had reached an agreement obviating the necessity for any further consideration thereon. Based on that agreement, the court ordered that no preliminary injunction shall issue. Except for the denial of Management's motion to strike the February 2 complaint and their subsequent answer to that complaint, nothing further transpired in the case until the Operatives filed their September 16, 1985, motion for a temporary restraining order and injunctive relief. It is from the order denying this September 16 motion that the Operatives appeal.
[3] By its order, the trial court denied only the Operatives' motion for preliminary injunction, apparently reserving their request for permanent injunctive relief for consideration at a later date.
[4] We recognize that the validity vel non of the resolution has not been determined, as a matter of law, by this order denying the Operatives' request for preliminary injunctive relief, and that its validity will be determined by a trial on the merits of the Operatives' request for a permanent injunction. Nevertheless, because the parties argue this preliminary finding by the trial court, among others, we deem it appropriate to address the proper construction of this specific provision setting out the procedure for calling a special trustees meeting.
[5] Under this section of the ACIPCo by-laws, the following are, in effect, preconditions to the appointment of an attorney by the presiding judge:
(1) Disputes between the two units (Management and Operatives) of the board of trustees;
(2) Direction to the secretary by either unit to refer the dispute(s) to the board of directors for resolution;
(3) Such referral made in writing by the secretary to the board of directors; and
(4) Petition brought by either unit, to the presiding judge of the court having jurisdiction of the Eagan trust, requesting the appointment of an attorney who is (a) authorized to practice law in Birmingham, Alabama, and (b) not a member of either unit of the board of trustees.