ALMON, Justice.
This appeal is from a judgment on a verdict for the defendants in an action claiming damages for inverse condemnation and damages pursuant to 42 U.S.C. § 1983. The plaintiffs are owners of land bordering Paradise Lake and an unincorporated association formed by those owners to hold title to the lake itself. The defendants are Jefferson County and its commissioners. Jefferson County operated a sewage treatment plant upstream from Paradise Lake from 1959 through 1987. The plaintiffs filed this action on September 28, 1984, claiming that, by discharging untreated sewage into the stream and thence into Paradise Lake, Jefferson County had taken their property without just compensation. In answers to special interrogatories, the jury found that there had not been a taking in violation of the Alabama Constitution or “in violation of Title 42, Section 1983, United States Code.”
The plaintiffs state the issues as follows:
“I. Whether the evidence in its entirety shows that Jefferson County’s actions amounted to an invasion of plaintiffs’ rights and was a taking of plaintiffs’ property for public use without just compensation in violation of plaintiffs’ civil rights under 42 U.S.C. section 1983 and plaintiffs’ rights under the Alabama Constitution.[1]
“II. Whether under the facts, circumstances, and evidence, it was reversible error for the trial court to charge the jury that it must find for the defendant [sic] if the jury found that a taking occurred prior to September 28, 1983.
“HI. Whether it was reversible error for the trial court to charge the jury to the effect that Jefferson County could not be liable to the plaintiffs under section 1983 unless the jury found that the county had acted arbitrarily and capriciously and with bad faith.”
In 1957, Jefferson County commissioned an engineering study of Patton Creek to determine whether a sewage disposal facility could be built that would discharge its effluent into the creek. At the time, a small dam on Patton Creek formed a pond where a larger dam now forms Paradise Lake. The report from the engineering study stated that, if the facility was built at the proposed site upstream from the dam, its effluent would tend to settle in the pond, causing the pond to become septic and to emit noxious odors. The report stated that this was particularly true because Patton Creek had almost no flow in dry weather, so that 90% or more of the water flowing into the pond in dry weather would be effluent from the sewage treatment facility. The report recommended that, if the proposed site was used, the county should acquire the dam and remove it or discharge the effluent through an outfall sewer below the dam. Notwithstanding that recommendation, the county built the treatment plant at the proposed site, without purchasing or condemning the downstream dam or routing the effluent below it.
The plant went into operation in 1959. At that time, the property that is now Paradise Lake and the surrounding lots was owned by Mrs. Mattie L. Stringfellow. Also in 1959, Mrs. Stringfellow applied for approval of a proposed subdivision of the property. The first sector of the subdivision was approved by the Jefferson County Health Department in June 1959 and the second in August 1959. Paul Pate, who was assistant director of the Jefferson County Health Department’s Bureau of Sanitation at the time, testified that the health department was involved in approval only because septic tanks and wells were to be used in the subdivision. He testified that the health department would approve such a subdivision “Provided it met the regulations of the department ... and the [requirements for] using on-site waste systems and, if public water supply is not available, individual wells.” Plaintiffs’ exhibit 82 is a letter dated August 27, 1989, from Pate to Mr. W.W. Dunn, of the Jeffer *814 son County Planning and Zoning Commission, notifying Mr. Dunn of the health department’s approval of the subdivision and describing the septic tank and well requirements to be followed in the development.
Mr. Pate testified that the health department did not have to approve the lake. His testimony included the following:
“Q. At the time you first became involved in these people making applications to build this subdivision, did anybody make any representation to you that there was going to be a lake built in conjunction with this subdivision?
“A. Not to my knowledge.
“Q. Did you later at any time address the developers of that subdivision about the advisability of building a lake downstream from a wastewater treatment plant?
“A. Sometime in [1959] I did address the subject.
“Q. That communication about the lake, was it expressed in writing?
“A. Yes.
“Q. Can you tell the jury whether or not you have been able to — whether you know where that letter or writing is today?
“A. I wish I could.
“Q. Have you made a search or asked somebody to look for that letter?
“A. Yes. I reviewed the letter on the day my deposition was taken by Mr. Yearout’s firm because I wanted to familiarize myself with what had transpired. So when I finished with my deposition I went to the Health Department on my own, asked for all files relating to the Paradise Lake development and the Patton Creek development. In reviewing the files I did scan this letter. I thought it would be subpoenaed and it would be a part of the records. Now it can’t be found.
“Q. Your deposition was taken September 29, 1989. That’s only about six weeks ago.
“A. Yes.
“Q. Is your testimony today about that letter based on your review of the letter approximately six weeks ago?
“A. Yes.
[[Image here]]
“Q. Tell the jury what advice you gave to the recipient of that letter about whether or not in 1959 they should build a recreational lake below the discharge points of the Patton Creek wastewater treatment plant.
[[Image here]]
“A. My recommendation was I would not recommend a recreational lake that close upstream [sic] to a major sewage treatment plant.
“Q. Why is that?
“A. From the health standpoint that you get 3,000,000 gallons of treated wastewater, it’s still polluted. It’s still carrying millions and billions of bacteria that could be hazardous to the health. And it would not have any dilution; the lake would not have any dilution during the summertime. I had seen at that time zero flow in Patton Creek. Therefore, the total flow through the lake would be from the sewage treatment plant. And, therefore, you would get the viruses and bacteria that are hazardous to health that would be concentrated in the lake. And my sole thought was from that standpoint, not from the raising of fish, and so forth.”
In spite of Pate’s advice, Mrs. String-fellow built a dam some time between late 1959 and 1962, forming Paradise Lake. The first subdivision lot was sold in August 1960. The first purchase by any of the plaintiffs in this action came in 1962. Pursuant to the Clean Water Act of 1967, the Alabama Water Improvement Commission (“AWIC”) developed water quality criteria, and, in 1972, Patton Creek was classified as appropriate for agricultural and industrial use. That classification was for the lowest quality waters, and waters subject to that classification were deemed to be unfit for recreational use or for fishing.
In 1973, Dr. George P. Whittle, a professor of civil engineering at the University of Alabama, was project director of a contract let by AWIC to study conditions at Patton Creek and Paradise Lake. Dr. Whittle tes *815 tified that Paradise lake was highly polluted and a health hazard when he first visited it in November 1973. His report included the statement:
“Since the lake water is formed from an appreciable sewage flow, the contractor respectfully suggests that a potential health hazard exists. It is recommended, as a minimum step, that signs be erected along the shore of the lake warning of possible health dangers from contact with the water.”
He testified that, given the flow of Patton Creek and the effluent from the wastewa-ter treatment plant, the unhealthy conditions would have existed by 1960 if the dam was built in 1959. He explained that the dam’s impoundment of the effluent would cause the impurities to settle rather than to flow downstream and would otherwise exacerbate the deleterious effects of the effluent. Dr. Whittle also testified that, looking at the data from studies conducted in 1985 and 1986, he concluded that the water quality had not deteriorated after he did his study in 1973.
The plaintiffs claim that, sometime around 1973, the amount of sewage coming to the Patton Creek Wastewater Treatment Plant began to exceed the capacity of the plant. They contend that, beginning in 1975 or 1976, the County allowed raw or partially treated sewage to bypass the plant on a regular basis because of the excess sewage reaching the plant. As part of its statute of limitations defense, the County introduced a September 4, 1974, letter from one of the owners of property bordering the lake to an official with AWIC, complaining that “In recent weeks there has been a noticeable amount of what appears to be raw sewage in the lake.” The plaintiffs introduced detailed evidence of the amount of sewage that, from 1979 through 1987, when the plant was taken out of service, was only partially treated or that bypassed the plant completely. They also introduced evidence of the worsening condition of the lake during this period. This, they claim, amounted to a taking of their property without due process or just compensation.
Our review of the record, and particularly the evidence summarized above, leads to the conclusion that the jury properly could have found that Jefferson County did not take the plaintiffs’ property, for either of two reasons. First, the jury could have found that, because the treatment plant was in operation before the dam that formed Paradise Lake was built, the lake was unfit for recreation or fishing from its inception and that the worsening of that condition did not constitute a taking of property rights. In other words, the jury could have found that the plaintiffs never had a property right in a clean lake because the building of the dam created a lake that necessarily would not be clean. Furthermore, from Mr. Pate’s testimony, the jury could have found that Mrs. String-fellow knew before she built the dam that it would create a health hazard.
Second, the jury could have found that, if there was a taking, it occurred while Mrs. Stringfellow still owned the land. The trial court gave the jury the following instruction, without objection from the plaintiffs: “I charge you that the right of action for the taking of land accrues to the owner at the time of the taking and will not pass by conveyance of the property.” Given that the engineering report made prior to construction of the plant recommended that the existing small dam be condemned, the jury could have found that there was a taking of the property at the time of the construction of the plant and that the taking was of Mrs. Stringfellow’s property, not of the plaintiffs’. Thus, under the above-quoted instruction, the jury could have found that Mrs. Stringfellow’s right of action for the taking of her property did not pass to the plaintiffs through the conveyance of lots to them.
A jury’s verdict is presumed correct, and that presumption is strengthened by the trial court’s denial of a motion for a new trial. The denial of a motion for new trial will not be overturned on appeal unless the verdict is so decidedly against the great weight and preponderance of the evidence as to convince the reviewing court that the judgment on the verdict is mani *816 festly unjust. Atkins Ford Sales, Inc. v. Royster, 560 So.2d 197 (Ala.1990); Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989); Cobb v. Malone, 92 Ala. 630, 9 So. 738 (1891), overruled on other grounds, Jawad v. Granade, 497 So.2d 471 (Ala.1986)
The jury, in answer to special interrogatories, found that there had not been a taking of any of the plaintiffs’ property either in violation of the Alabama Constitution, see art. I, § 23, or “in violation of” 42 U.S.C. § 1983. For the reasons stated above, that finding was not against the great weight and preponderance of the evidence or manifestly unjust.
Because the jury found that there had been no taking, we need not address the plaintiffs’ second issue, as to the statute of limitations applicable to the alleged taking. Similarly, we need not address the alleged error regarding the standard for recovery under 42 U.S.C. § 1983; any such error could not have affected the claim under the Alabama Constitution. Section 23 of the Alabama Constitution simply prohibits the taking of property for public use without just compensation. The jury found no such taking. The § 1983 claim depends on a finding that there was such a taking. Because the jury found that there was no taking, the plaintiffs could not have succeeded on their § 1983 claim even if the trial judge had instructed the jury that a physical taking is actionable under § 1983 without regard to a defendant’s standard of care, as the plaintiffs contend he should have. Any error in regard to the second and third issues would have been harmless. Rule 45, Ala.R.App.P.; Greene v. Thompson, 554 So.2d 376 (Ala.1989); Adams v. Farlow, 516 So.2d 528 (Ala.1987).
As to the plaintiffs’ appeal, the judgment on the verdict is affirmed. The cross-appeal is dismissed as moot. The plaintiffs’ motions to strike portions of the appellees’ brief and to strike the cross-appeal are moot.
89-999 — AFFIRMED.
89-1099 — DISMISSED AS MOOT.
HORNSBY, C.J., and HOUSTON, STEAGALL, KENNEDY, and INGRAM, JJ., concur.
MADDOX and ADAMS, JJ., concur in the result.

1. We treat the argument under this issue as a contention that the trial court erred in denying the plaintiffs’ motion for a new trial on the ground that the verdict was against the great weight and preponderance of the evidence.